**ANALYTIC RECRUITING, INC., Plaintiff,**

v.

**ANALYTIC RESOURCES, LLC, Defendant.**

**No. CIV. A. 01–CV–783.**

United States District Court, E.D. Pennsylvania.

July 23, 2001.

Larry H. Spector, Laurence J. Schempp, Mann, Ungar, Spector, Labovitz, Philadelphia, PA, for plaintiff.

Glenn S. Gitomer, Janeen Olsen Dougherty, McCausland, Keen & Buckman, Radnor, PA, for defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Before me is plaintiff Analytic Recruiting, Inc.'s ("Analytic Recruiting") request for injunctive relief on its claims of trade name infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), and unfair competition under the common law. On May 9, 2001 through May 11, 2001, I held an evidentiary hearing on plaintiff's motion for a preliminary injunction. At the close of the hearing, the parties agreed that the record was complete for purposes of determining what if any permanent relief is appropriate. I will now grant a permanent injunction.

## I. Findings of Fact

Having considered all of the testimony and exhibits offered at trial, I make the following findings of fact:

### A. The Parties

1. Plaintiff Analytic Recruiting is a nationwide recruiting firm that operates from its offices in New York City, New York. Analytic Recruiting has continuously operated under that name since

it was formed in 1980. It is co-owned by Rita Raz ("Raz") and her husband, Dan Raz. Raz is the President of Analytic Recruiting and is also one of its twelve (12) recruiters.

2. Analytic Recruiting specializes in placing individuals with sophisticated backgrounds and strong quantitative and analytical skills in permanent employment positions across a number of industry sectors in quantitative business positions. The individuals recruited for the positions are referred to as "candidates." The companies seeking individuals to fill its employment positions are referred to as "clients."

3. Positions for which Analytic Recruiting recruits include direct marketing analysis, credit-risk analysis, market research and sales forecasting, investment banking, and systems development.[1]

4. Over the past ten years, Analytic Recruiting has filled between two hundred and fifty (250) and three hundred (300) such positions per year with resulting billings of between five (5) and eight (8) million dollars annually.

5. Analytic Recruiting's corporate client base includes predominantly Fortune–One Thousand companies, as well as some mid-size and some smaller companies, in the United States.

6. In 1980 Rita and Dan Raz conceived of their new business because they thought that jobs requiring quantitative skills and the "slicing and dicing" of data would need to be created and filled to take advantage of the computational powers of computers. They chose the name "Analytic Recruiting" for their business because they thought that the word "analytic" sug-

gested the type of "braininess" or intelligence that was called for by such positions.

7. The majority of Analytic Recruiting's communications with candidates and corporate clients are oral, either by telephone or by email. In such communications, the firm's name is likely to be referred to in an abbreviated form as "Analytic."

8. In its twenty-one (21) year history, Analytic Recruiting has continually advertised in print, and more recently, electronic media. Since 1992, it has spent approximately $957,000 in such advertising, placing ads, both directly and through an advertising agency, in print media such as newspapers (principally the New York Times), and in trade periodicals such as Orms Today, Credit Card Management and Amstat News. Advertising through electronic media now takes place through the company's own web site and through other electronic media such as Dice. com, Headhunter.net, and Bloomberg. Relatively higher expenditures in advertising were made before 1992 when electronic media advertising over the internet was not available.

9. In all such ads, except in the New York Times where the space is especially expensive, prominence is given to the word "Analytic" within the company's name. The word "Analytic" is frequently portrayed independently of the full name of the firm and in much larger, bolder and more stylized type face. The company's web site gives similar prominence and separateness to the word "Analytic" on each screen within the site.

---

1. Systems development is concentrated primarily in the investment banking community in connection with developing, managing, programming, or operating trading systems.

10. The word "Analytic" is the only word on the door of the company's offices. The word "Analytic" is displayed separately and prominently from the company's name as a whole on its letterhead, on its envelopes, and on its memo pads. The word "Analytic" is superimposed on any resume which the company receives from a candidate and then forwards to a corporate client for consideration. The word "Analytic" is given prominence on Analytic Recruiting's written fee agreements with those clients. The word "Analytic," and only that word, is on the company's holiday greeting cards and on notes the company writes to send holiday gifts to its clients.

11. Analytic Recruiting over the years has promoted itself with merchandise bearing the name "Analytic", e.g., tee shirts, pocket calenders, mouse pads and baseball caps all of which have been distributed by the hundreds to clients or candidates.

12. To the extent that either the local yellow pages or the National Directory for Executive Recruiters contains any classification of types of recruiting firms, the classification is of recruiting firms as either permanent or temporary ("contract"). There is no classification or type of recruiting firm known as an "analytic" recruiting firm.

13. In the ordinary course of business, Analytic Recruiting receives job descriptions from corporate clients for positions they wish to fill and advertises those descriptions in print and electronic media. To the extent that the descriptions contain the word "analyst" or some derivation of the word analysis, the word is invariably used in a context which provides some further description of the nature of the analytical position involved, e.g.: Business/Sales Analyst; Manager Risk Analysis; AVP Segmentation Analysis; Quantitative Business Analyst; Database Marketing Analyst.

14. Other than Analytic Resources, Analytic Recruiting has been the only recruiting firm using the word "analytic" or any derivation of the word "analysis" in its company name since its inception. David Carpenter ("Carpenter"), defendant's principal, conducted a web search for companies using the name "analytic" and found a number of other companies doing something other than recruiting, i.e. companies involved in graphic design, advertising, legal consulting, and market research, using "analytic" as the dominant term in its company name, including two other companies with the name "Analytic Resources."

15. Defendant Analytic Resources, LLC ("Analytic Resources") is a limited liability company located in Ardmore, Pennsylvania. Carpenter is the defendant's President and Director of Executive Recruiting. Analytic Resources began its operations in early February 2000.

16. Analytic Resources is a nationwide recruiting firm that specializes in placing individuals with strong statistical, quantitative, and analytical backgrounds in contract positions in quantitative marketing, telecommunications, pharmaceutical and financial services (i.e. consumer credit, banks, retail credit) industries.

17. Analytic Resources seeks to place candidates with corporate clients having sales in excess of one billion dollars ($1,000,000,000).

18. Since it began operation, Analytic Resources has grossed more than two

and a half million dollars ($2.5 million) in revenue.

19. Carpenter conceived of the idea for Analytic Resources in February, 1999 while he was employed at Smith Hanley Consulting,° a division of Smith Hanley and a competitor of Analytic Recruiting. As of 1999, Carpenter had been employed by Smith Hanley for six (6) years. Up until sometime in 1995, Carpenter placed candidates for permanent positions in the pharmaceutical industry involving clinical drug trials. Subsequently, Carpenter set up a contract staffing division to place candidates in contract positions in the same field.

20. Carpenter's intent at the time he conceived Analytic Resources was to create a contract staffing firm for the pharmaceutical and marketing science or quantitative marketing industries.

21. Carpenter developed the name "Analytic Resources" sometime around July 14, 1999. Beginning in late September or early October 1999, Carpenter made repeated requests of his attorney to complete the filing of the Certificate of Organization for Analytic Resources. The Certificate of Organization was filed on December 13, 1999.

22. Carpenter testified that he chose the name "Analytic Resources" because he wanted a name that would mean something to the candidates and clients across the distinct industries that the company would be providing services to as a contract staffing company, namely, the pharmaceutical and financial services industries.

23. Wherever the name Analytic Resources appears, the name is followed by a further "signature" phrase such that the name and signature phrase together always read: "Analytic Resources—A Staffing Solutions Company." Mr. Carpenter added the signature phrase "A Staffing Solutions Company" because he wanted to fully identify the business in one burst and make sure that the public knew what Analytic Resources does.

24. Carpenter developed the Analytic Resources logo with the assistance of a graphic designer. The logo prominently focuses on the word "Analytic" and presents that word on a separate line in a distinct and different colored typeface from the word "Resources," which appears in much smaller print underneath the word "Analytic". The logo is used on virtually all of defendant's communications, electronic and print.

25. Carpenter testified that he selected the logo because it is very bold, has a "can't miss it" feel, and is a play on the mathematical symbol of a square root. Carpenter stated that he had experienced great success with a logo which had utilized mathematical symbols at Smith Hanley, and that he hoped to take advantage of a visual association between Analytic Resources and the people with quantitative backgrounds that it was servicing. When he selected the logo, Carpenter intended the dominant portion of the logo to be the character "A."

26. Analytic Resources communicates with its candidates and clients primarily by email and telephone. Analytic Resources identifies itself by its full name in both email and telephone communication. Defendant's email system has the imprinted signature with its full company name, phone number, title and email address. The phone system at Analytic Resources

is set up so that incoming calls are received by the receptionist. Ever since Defendant began its operations, Carpenter has instructed the receptionist to answer the phone saying, "Good morning [good afternoon], Analytic Resources, how may I help you." Defendant's account managers have received similar instructions from Carpenter, which instructions are taped to their computers, that they should present the company by saying, "Hello, my name is _____, I am from Analytic Resources. We provide contract staffing and/or executive recruitment services and I was just calling to introduce myself and to see if you have any staffing needs."

27. Analytic Resources does not advertise in print media. Carpenter anticipated that the company would advertise in trade journals when he first conceived of the new business. However, Carpenter testified that he has found print media to be unsuccessful and too passive. He also testified that it would be too costly for a start-up company.

28. Defendant advertises primarily through electronic media and by attending trade shows. The company has spent approximately $30,000 in advertising subscriptions to internet bulletin boards such as Monster.com, Headhunter.net and Dice.com. Since February, 2000, defendant has attended three trade shows sponsored by the National Conference for Database Marketing ("NCDM"), and is scheduled to attend one in the Summer 2001 and another one later in December 2001. Jim Sunderhauf ("Sunderhauf"), Defendant's Director of Business Services, is advertised as a featured speaker from Analytic Resources at the upcoming NCDM conference and is a regular speaker at these conferences.

29. Analytic Resources has utilized direct mailing/marketing on two occasions. In each instance, a direct mail card was sent to between 1,500–1,800 candidates. The mailings contained the defendant's name and logo and also identified defendant by the full company name, phone number, title and email address.

## B. Permanent vs. Contract Recruiting

30. Contract recruiting involves the temporary placement of a candidate who is an employee of the recruiting firm and is then contracted to the corporate client for a temporary assignment. The recruiting firm employs the candidate for the life of the contract and is responsible for paying and administering the candidate's salary and any employment benefits.

31. Permanent recruiting involves the placement of a candidate at a corporate client by which that candidate immediately becomes an employee of the client, and the recruiting firm has no further relationship with or responsibility for the candidate.

32. The permanent recruiting firm is compensated with one up front lump sum payment by the corporate client of a contingent fee which is generally a percentage of the candidate's first year salary in his permanent position. The contract recruiting firm is paid periodically by the corporate client for the services of the contract employee and makes a profit from the difference between the amount charged to the corporate client and the relatively lower amount paid by

the recruiting firm to the employee for wages and benefits.

33. The skills involved and required of someone working to place a candidate in a permanent position are entirely different from those used to fill a contract position. In the former situation the recruiter must be more relationship oriented with potential candidates since the candidate is actually being recruited to make a career change. A contract recruiter on the other hand is quickly trying to fill a temporary need for a corporate client, must act much more quickly, and does not have to deal with a candidate's long term concerns.

34. Analytic Recruiting is primarily involved in permanent recruiting but has also done contract recruiting throughout its existence, at least as far back as 1992. Analytic Recruiting's website identifies contract consulting as one of the categories of types of jobs it could place for interested clients and/or candidates. Contract placements have constituted ⅛ of 1% of Analytic Recruiting's business and there have been no more than two (2) or three (3) such placements in any given year. In some years, there have been none.

35. Analytic Recruiting has offered and filled contract positions in response to requests by its corporate clients to fill specific needs for contract employees. When Analytic Recruiting has received a request for a contract placement, those requests have come from the same clients for whom Analytic Recruiting receives requests for permanent placements. It has filled the requests for contract placements by drawing from its same pool of candidates that it utilizes for permanent placements.

36. When Analytic Resources began its business in February 2000, it filled only contract positions. Analytic Resources first began to fill requests for permanent candidates in July 2000, because the anticipated market for the pharmaceutical placements did not materialize as a result of mergers among pharmaceutical companies. Analytic Resources, therefore, shifted its resources from the pharmaceutical area to filling permanent placements in the financial services area. At that time, Sunderhauf had already been receiving requests from clients to provide permanent recruitment services which, to that point, Analytic Resources had been turning down. When it began to fill permanent positions it did so using the same pool of candidates and clients that it had developed for its contract placements.

37. Since July 2000, Analytic Resources has filled twenty-seven to thirty (27–30) permanent positions. The total revenues generated by permanent placements has been 12% of its total revenues from the time it entered the business in February 2000. This 12% represents a much greater percentage of the gross profits that it generated during the entire 15 months of its existence.[2]

C. Communication with Clients and Candidates

38. The contact person at Analytic Recruiting's corporate client is typically

**2.** As opposed to contract placements for which employee wages and benefits are an expense against gross revenues, there is no comparable reduction from gross revenues for permanent placements. Analytic Resources revenues on permanent placements, therefore, necessarily contributed disproportionately more to its overall profitability.

the hiring manager, the clerical assistant to the hiring manager, a member of the human resources department, or a clerical assistant to the human resources representative. Most hiring managers have undergraduate degrees and some have doctorate degrees. Often the hiring managers were born outside the United States. Forty-five to fifty percent (45–50%) of the hiring managers have a language other than English as their native language. Human resource contacts at the corporate clients usually have English as their first language.

39. The candidates that Analytic Recruiting tries to recruit are intelligent and have superior analytic skills in wide ranging technical, quantitative disciplines such as statistics, mathematics, computer science, operations research, physics and engineering, and can function in a business, as opposed to a purely scientific, setting. Many candidates have graduate and masters' degrees and all are sophisticated and have strong analytical skills.

40. 75% of the candidates that both plaintiff and defendant seek to place do not have English as their native language. The vast majority of candidates reviewed by Analytic Recruiting are rated either excellent or very good in their ability to comprehend and communicate the English language.

41. The average annual salary range for the candidates that plaintiff places is seventy thousand ($70,000) to one hundred and ten thousand ($110,000) dollars.

42. In the recruiting industry, neither candidates nor corporate clients enter into exclusive agreements with recruiting firms. Candidates often send their resume to more than one firm and corporate clients typically place jobs with a number of recruiting firms. Recruiting firms compete with other recruiting firms to place candidates with corporate clients and to get qualified candidates.

43. Because of the non-exclusive nature of this business, many clients have internal procedures in place for determining when and by whom a candidate is presented and to whom the fee for a successful placement is owed.

44. When a candidate is presented to a client, both plaintiff and defendant provide identifying information including the candidate's name, and the full name, phone number and contact person of the company proposing the candidate.

## D. Meeting Between Carpenter and Raz in December 1999

45. In the Fall of 1999, Carpenter sought financing for Analytic Resources.

46. In anticipation of doing so, Carpenter developed a business plan entitled, "A Business Plan for Analytic Resources" ("the business plan").

47. The business plan contemplated the establishment of a business called "Analytic Resources" which would provide contract employment services to the pharmaceutical and financial services industries. The business plan further identified defendant's potential client base in the financial services industry as "national in scope, and clients will be corporations with sales in excess of [one billion dollars]." The plan stated that the client base for Financial Services is expected to include companies such as Citibank, First USA and AT & T.

48. Carpenter first approached banks and venture capitalists for financing. When this proved unsuccessful, he then approached companies including Devon Direct, Devon Consulting and Stat Probe, as well as a sole proprietor. Carpenter approached each of these entities because he believed that their business would compliment the business he envisioned.

49. Analytic Recruiting was the last company that Carpenter contacted for financing purposes. Carpenter had heard of plaintiff from his former association with Smith Hanley. Before he met with representatives of Analytic Recruiting, Carpenter looked the company up in a trade journal and reviewed its website. As with the other companies Carpenter contacted before Analytic Recruiting, Carpenter believed that his new company could compliment Analytic Recruiting. He believed that there would be a great deal of potential synergy between the companies.

50. Carpenter called Raz to set up an exploratory meeting to discuss the possibility of Analytic Recruiting investing in Carpenter's proposed new business. Carpenter intended to ask plaintiff to invest between five-hundred and eight-hundred thousand dollars ($500,000 to $800,000).

51. After the telephone call and before the meeting, Carpenter's counsel sent a letter to Raz enclosing Carpenter's business plan. Raz read the business plan in preparation for the meeting. Raz discussed with Dan Raz the proposed name of defendant's potential new business, "Analytic Resources." They agreed that they were not pleased about defendant's use of the name.

52. When Raz read the proposed name "Analytic Resources" in defendant's business plan, she thought that the name was a sales tactic by defendant in hopes of convincing plaintiff that defendant's proposed business focusing on contract recruiting would be a beneficial division within plaintiff's current business. She assumed that the name was selected in an effort to demonstrate this potential relationship.

53. The meeting among Raz, Dan Raz, Carpenter, and Sunderhauf took place in or about December 1999 in Analytic Recruiting's offices in New York City. During the meeting, the defendant's proposed name "Analytic Resources" was not discussed. Plaintiff never objected to defendant's use of the name "Analytic Resources."

54. From the business plan and the meeting, Raz understood that, if defendant carried through its business plan, defendant would be marketing its contract recruiting services in the financial services area to many of the same clients that Analytic Recruiting was marketing its permanent recruiting services to.

55. At the meeting and in the written business plan, it was repeatedly emphasized that the new business would work entirely on contract, as opposed to permanent, recruiting. The section of the plan on the company's growth strategy did not indicate that it would do permanent placements in the future.

56. Neither Carpenter nor Sunderhauf ever told the Raz's whether they would or would not go forward with Analytic Resources if they did not receive financing from plaintiff.

57. Following the New York meeting, Rita and Dan Raz decided that they

did not want to invest in Carpenter's proposed new business, because they did not want to be involved in contract recruiting. They so advised Carpenter. Because, at that point, the Raz's did not know whether Carpenter would ever actually get started in his proposed business, and because Carpenter's plan was that Analytic Resources would do contract recruiting, as opposed to permanent recruiting, they did not state an objection to Carpenter's potential use of the name Analytic Resources.

### E. Plaintiff's Awareness of Defendant's Existence in the Marketplace and Evidence of Confusion

58. Plaintiff first became aware that defendant was actually in business in the Summer of 2000 when Raz saw a resume for a candidate reflecting that he had been placed in a contract position by Analytic Resources. In August 2000, one of plaintiff's recruiters, Laurie Kamens ("Kamens"), received a call from a recruiter named Pam Shiffman at Citicorp advising Kamens that there was another firm using the Analytic name out of Philadelphia. Kamens reported this information to Raz at the time. Plaintiff was not aware at that time that defendant had begun to do permanent recruiting in financial services. Plaintiff did not object to defendant's use of the name at that time.

59. Analytic Recruiting first learned in December 2000 that Analytic Resources had begun to do permanent recruiting. At that time, Analytic Recruiting became aware of the first of several instances of confusion experienced by either corporate clients or candidates as to whether they were dealing with Analytic Recruiting or Analytic Resources.

60. In one such case a representative of an Analytic Recruiting client, Columbia House, mistakenly called Analytic Recruiting to discuss a permanent candidate submitted to Columbia House by Analytic Resources. Upon realizing her mistake the representative remarked: "oh, you know, I get it. Actually it was that other Analytic that sent this candidate. I hate them. They always send the wrong people."

61. In another case a client representative of Fleet Bank mistakenly sent job descriptions to Analytic Resources that she had intended to send to Analytic Recruiting.

62. Another client, First USA, called Analytic Recruiting to make an offer to a candidate that had been submitted by Analytic Resources.

63. Another client, MBNA, sent job specifications to Analytic Resources believing that it was sending them to Analytic Recruiting, so the client did not contact Analytic Recruiting believing that it had already been in touch with someone at "Analytic."

64. One of Analytic Recruiting's clients inquired whether Analytic Recruiting had opened up a franchise operation in the Philadelphia area.

65. On at least six occasions, representatives of Analytic Resources made calls to introduce themselves to potential corporate clients by stating: "I am with Analytic Resources. We provide staffing services on both a permanent and contract basis for statisticians, modelers, SAS programmers and data analysts." The potential client would then respond: "Oh Analytic?" The Analytic Resources caller would then reply, "no." Carpenter acknowledged that the "no"

response was given because the Analytic Resources representative believed that the potential client's reference to "Analytic" was to plaintiff, Analytic Recruiting. The client would then be told that the call was coming from Analytic Resources in Philadelphia.

66. In one instance, a candidate sent an email inquiry about available positions to a recruiter at Analytic Resources thinking that she was sending her inquiry to Analytic Recruiting. The candidate revealed in the email that she equated the word "Analytic" with Rita and Dan Raz who she had known for twenty (20) years. The recruiter at Analytic Resources promptly responded by pointing out that she may have confused Analytic Resources with Analytic Recruiting.

67. On December 13, 2000, within in two weeks of having learned that Analytic Resources had begun making permanent placements, plaintiff through counsel wrote to Analytic Resources complaining that its name would cause confusion between the two companies and demanding that it begin operating under a different name. Defendant responded to the demand with a letter from counsel dated December 19, 2000 stating that plaintiff's position was without merit.

68. On February 15, 2001, plaintiff initiated this action by filing a complaint alleging a violation of the Lanham Act and the common law of unfair competition.

## II. Conclusions of Law

■ In deciding whether a permanent injunction should issue, I must consider whether: (1) the plaintiff has shown actual success on the merits; (2) the plaintiff will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest. *See Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir.2001). Plaintiff has met its burden on each of these factors.

### A. Success on the merits

■ Analytic Recruiting seeks to enjoin defendant from continuing use of the words "Analytic", "Analytic Resources", or any derivative of the word "analysis" as part of its trade name based on two claims: (1) infringement of plaintiff's trade name "Analytic Recruiting," in violation of the Lanham Act, 15 U.S.C. § 1125 [3]; and (2) unfair competition under the common law. Because courts have uniformly found the standards of proof to be the same under both causes of action, I will address these claims simultaneously. *See Standard Terry Mills, Inc. v. Shen Mfg. Co.,* 803 F.2d 778, 780 n. 4 (3d Cir.1986).[4]

---

**3.** Section 1125 of the Lanham Act provides in relevant part:

(1) Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which -
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services, or commercial activities by another person ...
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

**4.** 15 U.S.C. § 1115 provides for protection of registered trademarks. The major distinction between trademarks and trade names protected from infringement is that only trademarks

■ In order to prove trade name infringement, in violation of section 1125 of the Lanham Act, and unfair competition under the common law, plaintiff must prove: (1) the name "Analytic Recruiting" is valid and legally protectable; (2) the name "Analytic Recruiting" is owned by plaintiff; and (3) the defendant's use of the name "Analytic Resources" to identify its goods or services is likely to cause confusion regarding the source or sponsorship of its goods or services among the relevant customers. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.* 237 F.3d 198, 210 (3d Cir.2000).

■ The validity and protectability of a designated trade name "depends, in the first instance, on [its] level of inherent distinctiveness." *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986). Distinctiveness is divided into four categories:

> arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; suggestive terms, which suggest rather than describe the characteristics of the goods; descriptive terms, which describe a characteristic or ingredient of the article to which it refers, and generic terms, which function as the common descriptive name of a product class.

*Id.* at 296 (citations and internal quotation marks omitted). "In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning." *A & H Sportswear,* 237 F.3d at 222 (citation omitted).

■ Plaintiff's trade name, "Analytic Recruiting," is descriptive with secondary meaning. "Analytic Recruiting" is not merely a generic type of placement services. There is no evidence that consumers view analytic recruiting as a genus of recruiting services, in the way that they might, for example, distinguish permanent recruiting from contract recruiting services. *See Express Services, Inc. v. Careers Express Staffing Services,* 176 F.3d 183, 186 (3d Cir.1999) (holding that "Express" and "Services" in the trade name "Express Services" are not generic because they are not commonly viewed as a type of employment services). To the extent that either the local yellow pages or the National Directory for Executive Recruiters contains any classification of types of recruiting firms, the classification is of recruiting firms as either permanent or contract/temporary. There is no classification or type of recruiting firm known as an "analytic" recruiting firm. "Analytic" is not an adjective that is easily used to define a particular type of recruiting. *See Financial Systems Software v. Financial Software Systems,* 85 F.Supp.2d 482, 488 (E.D.Pa.1999) (classifying "Financial Systems Software" as generic because "financial" is an adjective "easily used to describe the type of 'systems software.'").

"Analytic Recruiting" is descriptive because it conveys an immediate idea of the type of services plaintiff provides. *See A & H Sportswear,* 237 F.3d at 222 ("Descriptive terms 'forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods.'") (quoting *A.J. Canfield,* 808 F.2d at 297). Plaintiff provides recruiting services to clients and candidates to fill positions that require

---

can be registered, entitling them to a presumption of validity and ownership. Because of the similarity between trademarks and trade names, courts apply case law interpreting these sections of the Lanham Act interchangeably. *See, e.g., Gideons Intern., Inc. v. Gideon 300 Ministries, Inc.,* 94 F.Supp.2d 566 (E.D.Pa.1999). The parties do not dispute this.

strong quantitative analytical skills. There is a direct and immediate connection between plaintiff's name, "Analytic Recruiting", and the nature of plaintiff's business. The name describes a characteristic of plaintiff's service. Therefore, the name is descriptive.[5]

■■■ Descriptive marks are entitled to protection only if they have acquired secondary meaning. *See A & H Sportswear*, 237 F.3d at 222; *Financial Systems Software*, 85 F.Supp.2d at 487. Secondary meaning is demonstrated where, "in the minds of the public, the primary significance of a ... term is to identify the source of the product itself." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 (3d Cir.1991) (citation omitted). *See also Financial Systems Software*, 85 F.Supp.2d at 488 ("For a party to prove that its mark is distinctive (not generic), it must 'show that the primary significance of the term in the minds of the consuming public is not the product but the producer.'") (citation omitted). "Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978). The Third Circuit has further suggested a non-exclusive list of factors which may be considered in evaluating whether a term has acquired secondary meaning. *See Ford Motor Co.*, 930

F.2d at 292. These factors include: (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion. *See id.*

In this case, there is sufficient evidence that "Analytic Recruiting" has acquired secondary meaning, i.e. that the primary significance of the name among consumers is the plaintiff, not the service plaintiff provides. In its twenty-one (21) year history, Analytic Recruiting has continually advertised in print, including in prominent newspapers and trade journals, and more recently in electronic media, including its own web site and other related web sites. In all such advertising, prominence is given to the word "Analytic," which is frequently portrayed independently. There is substantial similarity between defendant's name "Analytic Resources" and plaintiff's name "Analytic Recruiting." The similarity is accentuated by the prominence both parties give to "Analytic" in advertising and presentation of its name. *See id.* at 297 (finding that evidence of copying "can be inferred from the close resemblance of the [trade names] at issue."). The evidence shows that both clients and candidates assume that "Analytic" refers to plaintiff. Even Carpenter

---

**5.** Plaintiff argues that "Analytic Recruiting" is suggestive. Suggestive marks "require consumer imagination, thought, or perception to determine what the product is." *A & H Sportswear*, 237 F.3d at 221–22 (listing the "COPPERTONE" name as the classic example) (citation omitted). Plaintiff contends that "the term 'Analytic' by no means conveys that the skills which are the focus of the company's recruiting efforts are those involving a quantitative discipline." "The term 'Analytic' could just as easily be referring to non-quan-

titative analytical skills." Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction at 9. Therefore, plaintiff asserts, "it would take imagination, thought or perception to deduce from the name 'Analytic Recruiting' the specialized quantitative nature of its recruiting business." *Id.* at 10. However, that "analytic" may have a broader meaning than merely quantitative analytics, does not detract from the fact that "analytic" is descriptive of the type of jobs plaintiff seeks to fill.

and defendant's employees assume that a consumer referring to "Analytic" is referring to plaintiff.[6]

Other than Analytic Resources, Analytic Recruiting has been the only recruiting firm using the word "analytic" or any derivation of the word "analysis" in its company name since its inception. In this case, the fact that companies in fields unrelated to recruiting use "analytic" or some derivation of "analysis" in their company name does not weaken the strength of plaintiff's name. *See A & H Sportswear*, 237 F.3d at 224 (explaining that while use of a portion of plaintiff's name in other markets is relevant to the determination of the strength of the mark, such use does not necessarily weaken the strength of the mark); *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 479 (3d Cir.1994) ("While other registrations and uses of [plaintiff's name] for related products and services would make the mark less strong if they were in the same market, their use in different markets and for products and services that are not closely related does not necessarily undermine [plaintiff's] claim of strength."). Here plaintiff's twenty-one (21) years of continuous and extensive advertising, giving prominence to the term "analytic", and the evidence that consumers commonly refer to plaintiff as "Analytic" outweigh the possibility that companies outside this market have weakened the strength of the name. Furthermore, the fact that plaintiff frequently refers to itself as "Analytic" when communicating with clients and candidates evidences plaintiff's own impression that the name has acquired secondary meaning.

Plaintiff has maintained a highly profitable nationwide business, filling between two hundred and fifty (250) and three hundred (300) positions per year with resulting billings of between five (5) and eight (8) million dollars annually. As will be discussed further below, plaintiff has presented evidence of actual confusion on the part of both clients and candidates as a result of defendant's use of "Analytic" in its name. In light of all of the above, plaintiff has amply proven that "Analytic Recruiting" has acquired secondary meaning. Because "Analytic Recruiting" is a descriptive term with secondary meaning, it is entitled to protection under the Lanham Act and the common law. Plaintiff has satisfied the first element of its claims.

■■■ With respect to the second element of plaintiff's claim, plaintiff's ownership of the trade name "Analytic Recruiting" is both unchallenged and easily established. Ownership is assigned to a party who is the first to adopt and continuously use the trade name. *See Financial Systems Software*, 85 F.Supp.2d at 487 (citing *Ford Motor Co.*, 930 F.2d at 297). Ownership rights are established by proof of actual and continuous use in the marketplace. *See id.* Here, defendant does not challenge plaintiff's assertion that it owns the name "Analytic Recruiting." Analytic Recruiting was the first company in the business of recruiting to use the term "Analytic" in its trade name. There is no dispute that plaintiff has continuously used the name "Analytic Recruiting" in the market for the past twenty-one (21) years. There-

---

**6.** On at least six occasions, representatives of Analytic Resources made calls to introduce themselves to potential corporate clients by stating: "I am with Analytic Resources. We provide staffing services on both a permanent and contract basis for statisticians, modelers, SAS programmers and data analysts." The

potential client would then respond: "Oh Analytic?" The Analytic Resources caller would then reply, "no". Carpenter acknowledged that the "no" response was given because the Analytic Resources representative believed that the potential client's reference to "Analytic" was to plaintiff, Analytic Recruiting.

fore, plaintiff owns the name "Analytic Recruiting."

 Finally, plaintiff has demonstrated that defendant's continued use of the name "Analytic Resources" is likely to cause confusion in the relevant market. A likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Dranoff–Perlstein Associates v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992) (citations omitted). "The marks need not be identical, only confusingly similar." *Country Floors, Inc. v. Partnership of Gepner and Ford*, 930 F.2d 1056, 1063 (3d Cir.1991). "[O]ne feature of a mark may be more significant than other features, and it is proper to give greater force and effect to that dominant feature." *Id.* at 1065 (internal quotations and citation omitted); *A & H Sportswear*, 237 F.3d at 216 ("[T]he general rule that marks should be viewed in their entirety does not undermine the common-sense precept that the more forceful and distinctive aspects of a mark should be given more weight, and the other aspects less weight.") (citing *Country Floors*, 930 F.2d at 1065). A plaintiff need not prove actual confusion to be entitled to relief under the Lanham Act; "likelihood is all that need be shown." *Ford Motor Co.*, 930 F.2d at 292 (quoting *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir.1990)).

In the case of directly competing goods or services, where the marks are highly similar, the court may evaluate likelihood of confusion based on the similarity of the marks alone. *See A & H Sportswear*, 237 F.3d at 214. Both factors are present in this case. Neither party disputes that they are directly competing. "Analytic Recruiting" and "Analytic Resources" are suffi-

ciently similar on their face to cause confusion, particularly in light of the dominance both parties give to "Analytic" in presentation of their name. *See Country Floors*, 930 F.2d at 1065 ("When the dominant portions of the two marks are the same, confusion is likely.").

Still, as the Third Circuit has recently advised, likelihood of confusion should be tested with reference to the following factors:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*See A & H Sportswear*, 237 F.3d at 214–15. Each factor is not necessarily accorded equal weight and I need only consider

the factors that are relevant in this case. *See id.* at 215.

The relevant "confusion" factors in this case further support a finding that plaintiff has demonstrated a likelihood of confusion.[7] "The single most important factor in determining likelihood of confusion is mark similarity." *See A & H Sportswear,* 237 F.3d at 216 (citing *Fisons Horticulture,* 30 F.3d at 476). The trade names in this case are highly similar. Although they are not identical, the dominant portion "Analytic" in both names are virtually indistinguishable, particularly from the perspective of a consumer not viewing the marks side by side. As discussed previously, plaintiff's name has acquired secondary meaning and, accordingly, strength in the relevant market. Plaintiff has demonstrated that even the sophisticated clients and candidates that they serve have been and are likely to be confused by the similarity between the two names. *See Interpace,* 721 F.2d at 464 (highlighting the fact that even sophisticated customers are likely to be confused as perhaps the most important factor). That both parties rely almost exclusively on oral and electronic communication with consumers makes it even more likely that confusion will arise.

Prior to defendant's commencement of business, Analytic Recruiting had been using its name without confusion for twenty (20) years. Analytic Resources commenced business in February 2000 and first entered the field of permanent recruiting in July 2000. Instances of confusion began to occur relatively soon thereaf-ter, plaintiff first becoming aware of such instances less than six months after defendant began permanent recruiting and less than one year after defendant opened for business. Defendant selected the name Analytic Resources and the company logo with full knowledge of their similarity to plaintiff's name and logo. The evidence of approximately ten known instances of confusion on the part of clients or candidates is significant given the relatively short period of time since defendant commenced business. Candidates have contacted defendant when they thought they were contacting plaintiff. Despite having internal procedures in place for determining when and by whom a candidate is presented, clients have mistakenly communicated with both plaintiff and defendant thinking them to be the other. Finally, the parties agree that they are both targeting the same client and candidate pool. Although, defendant does not advertise through print media, both parties rely heavily on electronic media and word of mouth. In light of all the above, plaintiff has demonstrated a likelihood of confusion, satisfying the third and final element of its claims under the Lanham Act and common law unfair competition.

**B. Defenses of Laches, Acquiescence, and Estoppel**

 Defendant asserts that plaintiff's claims are barred by the doctrines of laches, acquiescence, and estoppel. "Estoppel is not a separate defense but is referred to as 'estoppel by laches' and 'estoppel by acquiescence.'" *Guardian*

---

**7.** The evaluation of likelihood of confusion is essentially based on the same evidence required to show that a term has acquired secondary meaning. *See Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983) (stating that "[l]ikelihood of confusion and secondary meaning are in theory distinct concepts. In practice, however, the evidence required to show either, and the legal consequences flowing from a finding of either, will be virtually indistinguishable."). Although I have already found that "Analytic Recruiting" has acquired secondary meaning, I will proceed with application of the "confusion" factors for the sake of clarity.

*Life Ins. Co. of America v. American Guardian Life Assurance Co.*, 943 F.Supp. 509, 517 n. 5 (E.D.Pa.1996) (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 30.01–30.03 (3d ed.1996)). "The essence of an estoppel defense is that the defendant changed its position in reliance upon the misleading representation of the plaintiff." *Id.* (citing *Anheuser–Busch, Inc. v. Du Bois Brewing Co.*, 175 F.2d 370, 375 (3d Cir.1949)). Laches consists of two essential elements: (1) inexcusable delay in instituting suit, and (2) prejudice resulting to the defendant from such delay. *See Univ. of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040, 1044 (3d Cir.1982). "[L]aches denotes a merely passive consent." *Guardian Life*, 943 F.Supp. at 519 (quoting *McCarthy on Trademarks* § 31.41[1]). Acquiescence is a similar defense, but applies "when the trademark owner, by affirmative word or deed, conveys its implied consent to another" to use its name or mark. *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 804 (3d Cir.1998). The burden is on the defendant to prove the elements of the defense. *See id.* I find that defendant has failed to meet its burden to show that either defense applies to bar the requested relief.

▬ Defendant argues that plaintiff acquiesced to defendant's use of the name "Analytic Resources" in December 1999 when Carpenter met with Rita and Dan Raz to discuss the possibility of Analytic Recruiting investing in Carpenter's proposed new business. In support of this contention, defendant requests that I find that plaintiff affirmatively conveyed its consent by: (1) accepting the business plan indicating defendant's intent to use that name in December 1999; (2) participating

in the meeting with Carpenter in late December 1999 and early January 2000 without any objection to the name; and (3) engaging a telephone call between the principals of plaintiff and defendant following up that meeting without any objection to defendant's name. Defendant's Proposed Findings of Fact and Conclusions of Law at 40 ¶ 67. I decline to make any such findings.

Defendant is searching for an affirmative act evidencing consent by the plaintiff in December 1999 where there was none. Carpenter contacted plaintiff in December 1999 to inquire into plaintiff's interest in investing in defendant's proposed new business. Carpenter then sent plaintiff a copy of the business plan prior to his meeting with Dan and Rita Raz to discuss financing. It is inaccurate to say that plaintiff accepted Carpenter's business plan or defendant's proposed name when plaintiff reviewed the plan in preparation for the meeting. Other than defendant's conclusion, there is no evidence of this in the record.

In addition, the purpose of the meeting was to explore the possibility of Analytic Recruiting investing in Carpenter's proposed new business. There is no evidence that the proposed name "Analytic Resources" was ever raised or discussed at the meeting. Furthermore, although neither Carpenter nor Sunderhauf told the Raz's that they would not go forward with the business if they did not receive financing, it was never made clear to the plaintiff that defendant would, in fact, go forward with the business. Plaintiff reasonably assumed that there was a strong likelihood that defendant would not proceed absent funding, or that if defendant did proceed, it would do so under a different name.[8]

---

8. When Raz read the proposed name "Analytic Resources" in the defendant's business

plan, she thought that the name was a sales tactic by defendant in hopes of convincing

The parties were merely discussing a business plan. Under these circumstances, plaintiff's failure to object to the name either at the meeting or in the subsequent telephone call was not an affirmative act implying consent to defendant's use of the name. When defendant proceeded with its plan to commence business as "Analytic Resources" in February 2000, defendant assumed the risk that plaintiff would later object to its use of the name. There was no affirmative act indicating acceptance of the plan or the name in December 1999.

The next issue is whether plaintiff acquiesced in the Summer of 2000 when plaintiff first learned that defendant was actually in business. Sometime in the Summer of 2000, Raz saw a resume from a candidate reflecting that he had been placed in a contract position by Analytic Resources. Plaintiff was not aware at that time that defendant was expanding to do permanent recruiting in financial services.[9] Therefore, by failing to object to defendant's use of its name at this time, plain-

tiff, at most, acquiesced only to defendant's use of the name for contract recruiting. *See Univ. of Pittsburgh*, 686 F.2d at 1045 (holding that silence may constitute acquiescence when the owner of a trade name has knowledge of another party's use of its name and fails to object).[10]

Plaintiff became aware that defendant had begun to do permanent recruiting in December 2000. At that time, plaintiff learned of several instances of confusion experienced by either corporate clients or candidates as to whether they were dealing with Analytic Recruiting or Analytic Resources. Plaintiff then immediately sent a cease and desist letter to defendant demanding that it begin operating under a different name. Upon receiving defendant's response asserting that defendant found plaintiff's position to be without merit, plaintiff delayed only minimally before initiating this action.[11] Therefore, defendant has failed to show that plaintiff unreasonably delayed in instituting suit.

plaintiff that defendant's proposed business focusing on contract recruiting would be a beneficial division within plaintiff's current business. She reasonably assumed that the name was selected in an effort to demonstrate this potential relationship.

9. In light of the information on the candidate's resume and defendant's prior representations that Analytic Resources would be limited to contract recruiting, plaintiff reasonably assumed that the business was in fact limited to contract recruiting.

10. It is worth noting, however, that, in the Summer of 2000, defendant had no knowledge that plaintiff knew defendant had commenced business as "Analytic Resources." It was not until plaintiff sent defendant a cease and desist letter in December 2000 that defendant first learned that plaintiff was aware of defendant's existence. Prior to the cease and desist letter, there was still no affirmative act indicating consent to use the name upon which defendant could have relied. Defendant was unreasonable to rely on plaintiff's silence before December 2000, because, from

defendant's perspective, plaintiff may not yet have known that defendant opened its business as "Analytic Resources." Prior to the cease and desist letter, because defendant was aware of plaintiff and the similarity between the two names and logos, defendant assumed the risk that plaintiff would later object if and when it discovered that defendant was operating under the name. *See McCarthy on Trademarks* § 31:13 (noting that, in most cases, defendant can only assert that it relied on plaintiff's silence or inaction upon proof that defendant knew that plaintiff knew of defendant's use of the name. The only exceptions to this rule have been in cases where defendant showed that it had no knowledge of the owner's existence).

11. Plaintiff sent the cease and desist letter on December 13, 2000. Defendant responded on December 19, 2000. The Complaint in this action was filed on February 15, 2001. Given the time of year, less than two months delay in filing is not unreasonable.

Even if the relevant time period in considering plaintiff's delay is the period between Summer 2000 [12] and February 15, 2001 (date of filing), approximately six months, defendant has failed to show unreasonable delay. "Changes in the quality and quantity of the alleged infringement use can excuse delay in suing." *Guardian Life*, 943 F.Supp. at 520 (noting that in *Univ. of Pittsburgh*, the Third Circuit "held that laches does not bar an injunction where the defendant changed from modest local sales to a program of national sales."); *Univ. of Pittsburgh*, 686 F.2d at 1045 ("While [plaintiff] may have acquiesced in the former, it promptly objected to the latter."). Analytic Recruiting may have been willing to allow some modest encroachment on its trade name, i.e. defendant's use of the name so long as its business was limited to contract recruiting, which was only a minimal and tangential part of plaintiff's business, but unwilling to allow defendant to compete directly for Analytic Recruiting's principle business in permanent recruiting using its trade name. Failure to object to encroachment in a more limited market does not necessarily bar injunctive relief when a user later moves into the owner's more dominant market. *See Guardian Life* at 520–21. Furthermore, it was not until December 2000, less than six months after defendant began recruiting for permanent placements, that plaintiff first became aware of instances of confusion. Plaintiff's delay in stating an objection and instituting suit until it became aware that defendant had moved into permanent recruiting and that confusion was likely was not unreasonable. *See McCarthy on Trademarks* § 31:19 ("Laches should not necessarily always be measured from defendant's very first use of the contested mark, but from the date that defendant's acts first significantly impacted on plaintiff's good will and business reputation.") (citing *John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292 (E.D.Pa. 1976)), *aff'd in part and rev'd in part*, 587 F.2d 602 (3d Cir.1978).[13]

Where there was no unreasonable delay in instituting suit, there is no bar to injunctive relief. *See University of Pittsburgh*, 686 F.2d at 1045 (finding no bar to

---

12. Defendant has presented no evidence as to when during the Summer of 2000 plaintiff first learned that defendant was open for business. There is evidence that one of plaintiff's recruiters received a call from a client in August 2000 advising the recruiter that another firm using the name Analytic was operating out of Philadelphia. Therefore, I will calculate the relevant time period beginning in August 2000.

13. Cases in other jurisdictions are consistent on this issue. *See, e.g., Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc.*, 87 F.Supp.2d 567, 586 (E.D.Va.2000) ("A senior user has no obligation to sue until the likelihood of confusion looms large."); *Fourth Toro Family Ltd. Partnership v. PV Bakery, Inc.*, 88 F.Supp.2d 188, 198 (S.D.N.Y.2000) (holding that after a period of twelve years in which plaintiff did not object to defendant's use of trademark on local basis, it was not inexcusable delay to object when defendant started to encroach on plaintiff's national market) (citing *Miss Universe, Inc. v. Patricelli*, 271 F.Supp. 104, 110 (D.Conn.1967), *aff'd*, 386 F.2d 997 (2d Cir.1967) (per curiam) (laches is inapposite where "slow encroachment on plaintiff's preserve, of increasingly direct competition, and of sudden promotional expansion aimed at exploitation of a market created by plaintiff.")); *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 460 (4th Cir. 1996) (holding that despite plaintiff's knowledge of infringer's use of confusingly similar mark for ten years, plaintiff's delay in bringing suit did not constitute laches because the use had been in markets other than plaintiff's); *Parrot Jungle, Inc. v. Parrot Jungle, Inc.*, 512 F.Supp. 266, 270 (S.D.N.Y.1981) (concluding that modest encroachment, not objected to by plaintiff, did not bar plaintiff from challenging defendant's use of the same trade name when defendant sought to expand scope of its market).

injunctive relief in a case of silent acquiescence by trademark owner, because there was no unreasonable delay); *Pappan Enterprises*, 143 F.3d at 804 (affirming the district court's finding that laches and acquiescence do not apply where there was no unreasonable delay). Estoppel is an equitable defense left to the sound discretion of the district court. *University of Pittsburgh*, 686 F.2d at 1045. "[I]ts application is inextricably bound up with the nature and quality of the plaintiff's claim on the merits." *Id.* at 1044. Estoppel should not be employed in a case, such as this, where there is a strong likelihood of confusion if defendant is permitted to continue to use plaintiff's trade name and where plaintiff is not guilty of unreasonable delay. Therefore, defendant is without a valid defense, and Analytic Recruiting has demonstrated success on the merits of its claims.

### C. Irreparable Harm

■■■■ Once success on the merits is proven, a determination of the appropriate relief further depends on the likelihood of irreparable harm to plaintiff if injunctive relief is not granted, potential harm to defendant of granting injunctive relief, and the interest of the public in such relief. Irreparable harm is injury that cannot be adequately compensated by monetary relief. *See Opticians*, 920 F.2d at 195 (citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d. Cir.1987)). The Third Circuit has held that once the likelihood of confusion between trade names in the market has been established, "the inescapable conclusion is that there [is] also irreparable injury." *Pappan Enterprises*, 143 F.3d at 805 (citing *Opticians*, 920 F.2d at 196–97). Therefore, plaintiff has satisfied this requirement. Additionally, irreparable injury includes loss of control of reputation, loss of trade, and loss of goodwill. *See id.* Defendant's continued use of the name "Analytic Resources" will cause plaintiff loss of control of and potential damage to plaintiff's reputation in the marketplace. *Opticians*, 920 F.2d at 195 (citing *Ambassador East, Inc. v. Orsatti, Inc.*, 257 F.2d 79 (3d Cir.1958)). This is an injury regardless of whether the infringer were to ultimately tarnish the name or divert any sales by its use. The possibility of damage to reputation due to lack of control alone constitutes the injury. *See id.* (citing *Ambassador East; Yale Electric Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir.1928); *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.*, 656 F.Supp. 449, 457 (D.N.J.1987)) (where there is loss of control, "the potential exists that defendant's use of a name confusingly similar to plaintiff's service mark will result in damage to plaintiff's reputation.").

### D. Harm to Defendant

■■■■ I must also consider the relative hardships to the parties of granting injunctive relief. In this case, injunctive relief would not harm defendant, the infringer, more than denial would harm plaintiff, the owner of the name. It is inevitable that defendant will incur certain expenses in changing its trade name. However, plaintiff's potential loss of clients and, therefore, revenue far outweighs any detriment to defendant. *See Opticians*, 920 F.2d at 197. Furthermore, even if defendant in good faith selected the name "Analytic Resources" without intent to infringe on plaintiff's trade name or to profit from plaintiff's reputation, defendant selected a name substantially similar to plaintiff's name with full knowledge of the similarity. Defendant, therefore, assumed the risk of potential harm that would result if plaintiff later objected. "Protection of infringers is not a purpose of the Lanham Act." *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir.1981). Under

these circumstances, any injury that defendant might suffer as a result of an injunction is outweighed by the irreparable harm to plaintiff.

### E. Public Interest

■ Finally, in a trademark or trade name case, the public interest is most often defined as the right of the public not to be deceived or confused. *See Opticians*, 920 F.2d at 197 (citing 2 *McCarthy on Trademarks*, § 30:21; *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 156 (3d Cir. 1984)) (there is a public interest in the protection of the trademark and to avoid confusion in the public); *SK & F, Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1067 (3d Cir.1980) ("preventing deception of the public is itself in the public interest") *See also Pappan Enterprises*, 143 F.3d at 807. Because there is a likelihood of confusion created by the concurrent use of the names Analytic Recruiting and Analytic Resources, plaintiff has established that defendant's continued use of the name Analytic Resources would damage the public interest. *See Opticians*, 920 F.2d at 198.

### III. Conclusion

For all of the foregoing reasons, I find that Analytic Recruiting has demonstrated success on the merits of its trade name infringement and unfair competition claims. I further find that Analytic Recruiting has proven that it will suffer irreparable injury if Analytic Resources is permitted to continue to operate using "Analytic" in its name, and that the balance of hardships and public interest weigh in favor of granting injunctive relief. Accordingly, I will grant plaintiff's request for injunctive relief.

**AND NOW**, this 23rd day of July, 2001, **I ORDER** that:

(1) Plaintiff's motion for injunctive relief (docket entry # 2) is **GRANTED**.

(2) The parties shall meet by **July 30, 2001** in an attempt to reach a stipulation for an injunctive order.

(3) If an agreement cannot be reached, plaintiff shall submit a proposed injunctive order by **August 3, 2001**.

(4) Defendant may submit a counter proposed injunctive order by **August 10, 2001**.