**URBAN OUTFITTERS, INC., et al.**

v.

**BCBG MAX AZRIA GROUP, INC., et al.**

**Civil Action No. 06–4003.**

United States District Court,
E.D. Pennsylvania.

April 18, 2007.

484

Alfred W. Putnam, Jr., Mary E. Kohart, Michael J. Rinaldi, Noah A. Levin, William J. Lehane, William M. McSwain, Drinker Biddle & Reath LLP, Philadelphia, PA, for Urban Outfitters, Inc., et al.

Keith Lee, M. Kelly Tillery, Christopher D. Olszyk, Jr., Pepper Hamilton LLP, Philadelphia, PA, Neil B. Friedman, Stephen L. Baker, Baker & Rannells PA, Raritan, NJ, for BCBG Max Azria Group, Inc., et al.

Alfred W. Putnam, Jr., Mary E. Kohart, Michael J. Rinaldi, Noah A. Levin, William

J. Lehane, William M. McSwain, Drinker Biddle & Reath LLP, Philadelphia, PA, for Urban Outfitters, Inc., Urban Outfitters Wholesale, Inc., and Free People LLC.

Keith Lee, M. Kelly Tillery, Christopher D. Olszyk, Jr., Pepper Hamilton LLP, Philadelphia, PA, Neil B. Friedman, Stephen L. Baker, Baker & Rannells PA, Raritan, NJ, for BCBG Max Azria Group, Inc., Street Beat Sportswear, Inc., and Max Rave LLC.

## MEMORANDUM

MICHAEL M. BAYLSON, District Judge.

### I. Introduction

Plaintiffs, Urban Outfitters, Inc., Urban Outfitters Wholesale, Inc., and Free People LLC (collectively, the "Urban Group") moved on September 22, 2006 for this Court to enter a preliminary injunction to prevent Defendants BCGG Max Azria Group, Inc., Streetbeat Sportswear, Inc., and Max Rave LLC, from infringing on Plaintiffs' "Free People" mark. Plaintiffs allege that Defendants' plan to use the "True People" mark, currently owned by Defendant Streetbeat, on a new line of junior women's clothing will confuse consumers and infringe on Plaintiff's Free People mark in violation of Sections 32 and 43(a) of the Lanham Act. The Court held a series of hearings on Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 6) from January 9 through January 19, 2007.

At the end of these hearings, the Court met with counsel and agreed to decide the pending Motion for Preliminary Injunction, limited to the issue of whether Defendants would be able to exhibit True People goods at a February 2007 trade show, called the "Magic" show. Accordingly, a Memorandum and Order was entered on February 8, 2007 (Doc. No. 86), in which the Court determined that the Motion for Preliminary Injunction as to the February 2007 Magic show would be denied, based largely upon representations made by defense counsel and two signed declarations from Mr. Albert Papouchado, co-owner of Streetbeat Sportswear, Inc. and Co-President of Max Rave LLC, that Defendants would not engage in specific behaviors at the February 2007 trade show.

Shortly after the conclusion of the Magic show, Plaintiffs filed a Motion for Emergency Relief and Preliminary Injunction (Doc. No. 90) which alleged that, notwithstanding Mr. Papouchado's declarations, Defendants, or some of them, had violated their representations made to the Court. In response to this Motion, the Court held an evidentiary hearing and argument on February 23, 2007.

This Court must now decide the remaining issues in Plaintiffs' original Motion for Preliminary Injunction as well as Plaintiff's more recent Motion for Emergency Relief and Preliminary Injunction. For the following reasons, these motions are granted in part and denied in part.

### II. Factual Background

Plaintiffs in this case are Urban Outfitters, Inc., a large manufacturer, wholesaler, and retailer of clothing and accessories and two of its wholly-owned subsidiaries, one of which is Free People LLC. Urban Outfitters owns the Free People mark and name under which it sells Free People branded clothing in its own retail stores and in third-party retail stores throughout the United States, as well as through catalogs and the internet.

The Plaintiffs have sold clothing and related goods under the Free People mark continuously since 1970. The mark was registered with the United States Patent and Trademark Office on March 22, 1994, and became incontestable on November 9, 1999. Since 2002, Plaintiffs have also operated eight Free People stores for which they registered a service-related mark on September 30, 2003. (Pls.Exs.1–3.)

Urban has extensively marketed, advertised and sold clothing under its Free People mark through catalogs, websites, trade shows, and national publications including *Women's Wear Daily, Seventeen, People, In Style,* and the *New York Times.* (Tr. 9, 11–16, Jan. 9, 2007; Pls. Ex. 20–170, 205, 287.) Sales of Free People goods have increased substantially in recent years going from $18 million in 2001 to $58 million in 2005. (Tr. 13, Jan. 9, 2007; Pls. Ex. 4.) Urban Outfitters' Chairman of the Board of Directors and President, who is also its founder, Richard Hayne, testified that Free People sales were expected to approach $80 million in 2006. (Tr. 5, 11, Jan. 9, 2007.)

The Defendants are BCBG Max Azria Group, Inc. ("BCBG"), a company that designs and markets several well-known national upscale clothing brands; Max Rave LLC ("Max Rave"), a wholly-owned subsidiary created by BCBG to operate and manage retail stores selling lower priced women's clothing; and Streetbeat Sportswear, Inc. ("Streetbeat"), a separate company that manufactures and distributes wholesale lower priced women's clothing, which is contemplating a merger with BCBG.

Defendant BCBG operates more that one hundred BCBG Max Azria boutiques in the United States. These stores are "upscale" and have no plans to sell True People brand clothing. (Tr. 182, Jan. 12, 2007.) In late 2005, Albert Papouchado brought to the attention of Max Azria, who owns BCBG, that G+G Retail, Inc. ("G+G"), a company that operated over 550 mostly mall-based stores under the names Rave, Rave Girl, and G+G, was contemplating filing a bankruptcy petition. (Tr. 201–02, Jan. 9, 2007). After failing to acquire G+G before it went it into bankruptcy, BCBG purchased the assets of G+G at a bankruptcy auction and created a new company, Defendant Max Rave, to operate and manage the acquired G+G stores. (Tr. 201–02, Jan. 9, 2007.) Max Rave plans to rebrand the remaining 480 G+G stores and has contemplated a number of new names for the stores including BCBG Girls, To the Max, and True People. (Tr. 126–30, 133, Jan. 12, 2007.)

Defendant Streetbeat registered the True People mark with the United States Patent and Trademark Office on March 3, 2001, and that mark became incontestable on March 3, 2006.[1] (Defs. Ex. 58; Tr. 10,

---

1. Pursuant to 15 U.S.C. § 1065, a federally registered trademark becomes incontestable if it has been in continuous use for the five years subsequent to the mark's registration. Notwithstanding this provision, the statute provides that a mark will not be incontestable "to the extent, if any, which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark." Therefore, the incontestability of the Defendant's mark does not shield it from an infringement action when the Plaintiff has established common law rights to the mark preceding the registration of the Defendant's mark. *See Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1395

(3d Cir.1985) (observing that a "federal registrant is still subject to the defense of a prior user of the mark who has established a market in specific areas notwithstanding that senior user's failure to register").

The evidence is well-established that clothing bearing the Plaintiffs' Free People mark has been advertised and sold nationally for a number years preceding the registration of Defendants' True People mark, and has accounted for a large portion of the Plaintiffs' sales, which continue to grow rapidly. (Tr. 9, Jan. 9, 2007). Thus, the Defendants' True People mark is not incontestable to the extent that it infringes on Plaintiff's Free People mark, notwithstanding the Defendants' federal registration of the True People mark in 2001.

15–16, Jan. 12, 2007.) Since as early as 1999, Defendant Streetbeat has manufactured junior women's clothing under the True People label. Prior to August 2006, seventy percent of that clothing was denim. (Tr. 24–26, 40, Jan. 12, 2007.)

According to Albert Papouchado, since 2000 Streetbeat has sold annually at wholesale in excess of $2.5 million worth of True People brand clothing (approximately $5 million in retail) to thousands of local and national retail stores located throughout the United States such as Family Dollar, Bealls Outlet Stores, Foreman Mills, G + G, Joyce Leslie, and, since February 2006, Max Rave. (Defs. Ex. 25, 51, 94; Tr. 30, Jan. 12, 2007.)

It was not until August 2006 at the "Magic" show, that Plaintiffs learned of the True People brand. (Tr. 88–91, Jan. 9, 2007.) The Magic show is a clothing industry trade show held twice a year in Las Vegas, Nevada where the major apparel manufacturers showcase their newest lines and seasons of clothing to wholesale distributors and purchasers, market analysts, and others in the clothing business. (Tr. 112–13, Jan. 9, 2007.) As they have done for a number of years, the Plaintiffs operated a Free People booth at the August 2006 Magic show, which was visited by a number of retailers who placed orders for Free People clothing, as well as by financial analysts and others. At the same show, Max Rave operated a True People booth for the first time which displayed True People branded clothing. (Tr. 95, Jan. 12, 2007.) Apparently as a matter of coincidence, the Free People and True People booths were located very near each other in the "young contemporary" clothing section of the show. (Tr. 95, Jan. 12, 2007.)

While standing at the Free People booth, Kristine Meehan, the Director of Sales for Free People, noticed a True People banner suspended from the ceiling and thought it bore a marked resemblance to photographs previously displayed in Free People catalogs. (Tr. 113–15, Jan. 9, 2007.) She noted that the font of the words "True People" on the banner as well as their color were reminiscent of past Free People advertisements. Ms. Meehan then located the True People booth and observed that the manner in which the True People booth was decorated, including the use of a shag rug, a hanging chandelier, and cloth bags to distribute materials, was reminiscent of Plaintiffs' stores and the clothing displayed in the booth resembled similar clothing sold by the Plaintiffs. *Id.* at 118–19.

Plaintiffs obtained a copy of the True People catalog that the Defendants' employees had been distributing at the True People booth, as well as a copy of True People's "line sheets," [2] exhibiting the designs for the new line of clothing. (Tr. 123–24, Jan. 9, 2007.) After reviewing these materials, the Plaintiffs sent a cease and desist letter to Defendant BCBG on August 30, 2006. (*Id.,* Pls. Ex. 296.)

Although Defendants took orders at the Magic show, they were insufficient to warrant production of the True People garments exhibited at the show. Accordingly, all of the orders taken at the August 2006 show were cancelled. (Tr. 96–97, Jan. 12, 2007; Tr. 30, 92–93, Jan. 16, 2007.)

On September 8, 2006, Plaintiffs filed an action in this Court under Sections 32 and 43(a) of the Lanham Act and the laws of the Commonwealth of Pennsylvania against the Defendants BCBG and Streetbeat (Max Rave was added later), for

---

**2.** Line sheets, as they are known in the clothing industry, contain illustrated designs of the clothing being sold by a given manufacturer which are distributed to wholesale clothing buyers for ordering purposes. (Tr. 125, Jan. 9, 2006.)

trademark infringement, unfair competition, false designation of origin, and unjust enrichment. The Plaintiffs seek injunctive relief and monetary damages. After the Plaintiffs filed a Motion for a Preliminary Injunction on September 22, 2006, the parties engaged in an expedited discovery period. The Court held extensive hearings and arguments on Plaintiffs' motion over six days from January 9 to 19, 2007.

Defendants have filed an intent-to-use application for True People as a service mark with the United States Patent and Trademark Office. Nonetheless, as of the January hearings, they had not committed to any course of action to use the True People brand as the name for either the stores owned by Max Rave or the clothes to be sold in those stores. *Id.* (Tr. 90, 92, 133, Jan. 12, 2007.) In addition, while Max Azria had expressed his intention to purchase Streetbeat from Mr. Papouchado and his partner, Michel Amar, a final deal had not been reached.

One issue raised at the January hearings was whether Defendants would be allowed to proceed with their plan to exhibit True People clothing at a True People booth during the February 2007 Magic show. As noted above, the Court entered a Memorandum and Order on February 8, 2007, in which the Court determined that the Motion for Preliminary Injunction as to the February 2007 Magic show would be denied, based largely upon defense counsel's representations and Mr. Papouchado's declarations. Mr. Papouchado's second declaration specifically noted the severe limitations that Defendants would place on their marketing efforts at the February 2007 Magic show and included an assurance that Streetbeat would not "distribute any brochure/catalog to promote its True People line or clothing." Plaintiffs filed a Motion for Emergency Relief and Preliminary Injunction shortly after the conclusion of the February 2007

Magic Show, contending that the Defendants had violated these representations by distributing brochures at the show. The Court held an evidentiary hearing and argument on this Motion on February 23, 2007.

At that hearing, Plaintiffs presented the testimony of Jill Bogan, an employee of Urban, by telephone. Ms. Bogan had also filed a declaration, which was attached to a copy of Plaintiffs' Motion, stating that she had attended the February 2007 Magic show and had visited the True People booth, where she found brochures being distributed. Despite cross-examination, her testimony at the hearing was similar to the statements contained in her declaration, and the Court finds that her testimony, as corroborated by exhibits, is correct.

The actual exhibit from the Magic show came in a plain white cardboard folder with the name "True People" on the cover. "True People" appeared in a slightly different form from the logo used at the August 2006 Magic show. Inside was a multi-colored, single page pictorial that read as follows:

True People

Our True People collection is for the girl who dreams about a beautiful world and her place in it. True to herself, she imagines the best of everything in her fashion lifestyle from sweet and innocent to sassy and adventurous.

Also included in the folder was a single page description of different True People products under the following headings: mad plaids, st. tropez, westport debutante, and opposite attraction. Following that page were four pages of colored line sheets.

A good deal of the testimony at the February hearing concerned whether the material being distributed at the True People booth was a "brochure" or something else. Plaintiffs asserted that it was a bro-

chure, and thus, its distribution violated the undertaking by Mr. Papouchado, upon which the Court relied heavily in denying the preliminary injunction with respect to the February Magic show. Defendants countered that the materials being distributed were basically "line sheets" and that the other papers were merely introductory material. They also emphasized that the sheets were not bound together and were instead placed together in a folder. On cross examination, Mr. Papouchado asserted that his attorney had indicated that distributing line sheets at the Magic show would not constitute a brochure, and therefore, would not violate the declaration, but he had not discussed the inclusion in the folder of the pictorial and did not recall discussing the other descriptive material with his attorney. (Tr. 97–98, Feb. 23, 2007).

In further questioning, Mr. Papouchado again asserted that, although the Defendants are still in the process of negotiating an agreement for Max Rave to purchase Streetbeat and such an agreement was close to being signed, a final agreement had not yet been reached. He testified there were no specific plans to open True People stores. *Id.* at 101–02.

On balance, and having considered the testimony, the Court finds that the material distributed by True People at the February 2007 Magic Show constituted a "brochure" under the common definition of that term. Because Mr. Papouchado concealed his intentions about issuing a brochure at the February 2007 Magic show contrary to his sworn declaration, which was made under penalty of perjury, the Court seriously questions his credibility. Despite Defendants' repeated assertions that they have not made a final decision about whether they will use True People as the new mark on their clothing and stores, in light of Mr. Papouchado's damaged credibility and the testimony of BCBG's employee Russell Bowers and others, discussed below, about rebranding, the Court finds that this is the likely outcome if an injunction should not issue in this case.

A more detailed account of the evidence, as well as the Court's factual findings with respect to that evidence, are incorporated into the discussion below.

### III. *Legal Standard*

There is a four part test for evaluating whether a court should issue a preliminary injunction in a trademark case: (1) the likelihood that the applicant will prevail on the merits at a final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir.1990). Preliminary injunctive relief is an extraordinary remedy that should only be granted in limited circumstances. *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir.2004). In a trademark case, one of the purposes of a preliminary injunction analysis is "to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." *Id.* (quoting *Opticians Ass'n,* 920 F.2d at 197).

This Court has jurisdiction over Plaintiffs' claims pursuant to the Lanham Act, 15 U.S.C. § 1121, and pursuant to 28 U.SC. §§ 1331, 1338(a), and 1367.

### IV. *Discussion*

#### A. *Likelihood of Prevailing on the Merits*

Plaintiffs bring this case under Sections 32 and 43 of the Lanham Act alleging Defendants engaged in trademark in-

fringement and unfair competition.[3] In order to prevail on a claim for trademark infringement or unfair competition, a plaintiff who owns a valid, legally protectable mark, must show that the defendant's use of a similar mark for its goods causes a likelihood of confusion. *See Kos*, 369 F.3d at 708–09 (citing *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir.2000)). A likelihood of confusion exists "when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *A & H Sportswear*, 237 F.3d at 211 (internal quotation omitted). In cases involving directly competing goods where the marks are virtually identical, the court may look only at the marks themselves in determining likelihood of confusion. *Id.* at 212. When the confusing similarity of the marks is not apparent on its face, however, the court may also look to a list of factors that the Third Circuit has developed, called the "Lapp factors," to aid its analysis. *See Kos.*, 369 F.3d at 709; *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983). Although the Lapp factors were originally developed to evaluate the likelihood confusion between non-competing goods, the Third Circuit has since recognized that they are also useful in the comparison of goods that compete directly. *See Kos*, 369 F.3d at 709.

■ The Lapp Factors, as adapted for directly competing goods, are as follows:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Id.*

The Lapp factors set out what is essentially a qualitative inquiry. Depending on the individual factual circumstances of a given case, some of these factors may be more or less important to the court's evaluation of

---

**3.** Infringement is defined in Section 32 as the unauthorized use of "a colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." Section 32 provides that a person who engages in infringement is civilly liable to the owner of the legally registered mark. 15 U.S.C. § 1114(a)(1).

Section 43(a) creates a cause of action when any person "uses in commerce any word, term, name, designation of origin, symbol, or device . . . likely to cause confusion, or to cause mistake, or to deceive as to . . . . the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1).

the likelihood of confusion between two marks. *See A & H Sportswear,* 237 F.3d at 215–16. Nonetheless, the court must consider all of the factors in reaching its decision and explain its reasons for relying heavily on some or declining to rely on others. *See Kos,* 369 F.3d at 711–12. "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 280 (3d Cir.2001).

### 1. Validity and Legal Protectability of Plaintiffs' Mark

As an initial matter, the Court finds that Urban Outfitter's Free People mark is valid and legally protectable. Validity and legal protectability are established when a mark is federally registered and has become incontestable under the Lanham Act, 15 U.S.C. §§ 1058, 1065. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994). As noted above, Plaintiffs produced evidence that its Free People mark was registered on March 22, 1994 and became incontestable on November 9, 1999.[4] (Pls.Exs.1–2.)

### 2. Similarity of the Marks (Lapp Factor 1)

■ "The single most important factor in determining likelihood of confusion is mark similarity." *A & H Sportswear,* 237 F.3d at 216. Marks are confusingly similar "if ordinary customers would likely conclude that [the two products] share a common sources, affiliation, connection or sponsorship." *Fisons,* 30 F.3d at 477. In evaluating the similarity of two marks, the proper test is not "side-by-side comparison" of the marks but instead "whether the labels create the same overall impression when viewed separately." *Kos.,* 369 F.3d at 713 (internal quotation omitted). A mark's overall impression is created by the sight, sound, and meaning of the mark. *A & H Sportswear,* 237 F.3d at 217. The Court will consider each of these aspects of the two competing marks, "True People" and "Free People."

The marks True People and Free People share some similarities visually. Both marks contain four letter monosyllabic words used as a adjectives to modify the word "People." With respect to the first words themselves, the "T" and "F" are similar in appearance, and both words end in the letter "e." The "Free People" mark has appeared on a number of clothing labels, catalogs and advertisements in a variety of sizes, colors and fonts. (Defs' Ex. 9–11; Tr. 177, Jan. 9, 2007.) Many of these labels are in a cursive script, which appears handwritten, with the "F" and "P" capitalized and the remainder of the word in lowercase font. The True People mark, as it appeared at the August 2006 Magic show, also appeared to be handwritten but used all capital letters and was presented in both pink and white.[5] In addition, the

---

4. Plaintiffs asserted in their Pre–Hearing Memorandum that any evidence that Defendants' sought to introduce at the hearings of Plaintiffs' "unclean hands" with respect to their federal registration should be excluded as irrelevant and improper. Defendants responded in a supplemental brief on January 11, 2007 that the Court should allow and consider such evidence in determining whether to grant injunctive relief. Since neither party introduced any evidence on this point during the January hearings or raised it in their proposed findings of fact, it is unnecessary for the Court to resolve this issue at this time.

5. Defendants have represented that they have since altered their label to reflect a more "Art Deco" style which the Court agrees does not appear handwritten. (Defs.Ex. 12.) Given the Court's finding that the Defendants lack credibility when making assurances about the future actions they will take with respect to the True People brand, the Court focuses its

font used by True People on the label for one of its pairs of jeans bears some similarities to a frequently used Free People font. (Pls. Exs. 187, 217; Tr. 126, 134, Jan. 16, 2007; Tr. 18–20, Jan. 17, 2007.) Nonetheless, in light of the variety of incarnations of the Free People mark, and the fact that the True People mark primarily appears in all-capital letters, the Court finds that, in visual appearance, the marks are not confusingly similar.

The same conclusion holds true for the sounds of the two marks. Although "True" and "Free" both share one syllable, they clearly sound different. Finding a likelihood of confusion based on sound would require a much "closer phonetic similarity." *A & H Sportswear*, 237 F.3d at 217 (finding that "Miraclesuit" and "Miracle Bra" are not phonetically similar).

Finally, with respect to the meaning of the two marks, although "True" and "Free" have different definitions, they do share some similarity when used in context with the word "People" because they both describe a group of people who possess a positive attribute with which consumers would want to identify. The similarity ends there, however. There was a great deal of conflicting testimony at the hearing about the connotations of True and Free, and what kind of impressions those words create in the minds of the brands' targeted consumers. (*See, e.g.,* Tr. 38, 45–46, Jan. 9, 2007). In light of this conflicting testimony, the Court finds that the similarity of meaning between these two phrases is insufficient to establish a likelihood of confusion.

After considering the sight, sound and meaning of these marks, the Court concludes that the "overall impression" created by the phrases "True People" and "Free People" are somewhat distinct. Be-

cause the similarity of the marks does not, standing alone, lead to a likelihood of confusion, the Court will examine the other Lapp factors to aid its determination of whether Plaintiffs have shown a likelihood of success on the merits.

### 3. *Strength of Owner's Mark (Lapp Factor 2)*

In measuring the second Lapp factor, the strength of the owner's mark, a court must look to (1) the inherent features of the mark contributing to its distinctiveness or conceptual strength; and (2) the factual evidence of the mark's commercial strength or marketplace recognition of the mark. *See A & H Sportswear*, 237 F.3d at 221. The former question requires a determination of whether this mark is classified as generic, descriptive, suggestive or arbitrary and fanciful. *Id.* Only marks that are suggestive or arbitrary and fanciful are considered to be "inherently distinctive" and therefore entitled to Lanham Act protection. *Fisons*, 30 F.3d at 478. This is because "the classification system's primary purpose is to determine ... whether consumers are likely to perceive the mark as a signifier of origin, rather than as a mere identification of the type of product." *A & H Sportswear*, 237 F.3d at 222.

■ Nothing about the phrase "Free People" suggests women's clothing or the qualities or characteristics of that clothing. Thus, the mark bears "no logical or suggestive relation to the characteristics of the goods" to which it applies. *Id.* (quotation omitted). Instead, the mark serves as a signifier of its origin and invokes a particular, non product-specific feeling about the brand its represents, what Richard Hayne, the founder of Urban Outfitters, referred to as the brand's overall "gestalt."

discussion on the mark at it appeared in August 2006.

*See Fisons,* 30 F.3d at 478. Thus, the Court concludes that the mark is arbitrary or fanciful and entitled to Lanham Act protection.

■ Nonetheless, a finding that a mark is arbitrary or fanciful does not necessarily lead to a conclusion that it is conceptually strong. "Suggestive or arbitrary marks may, in fact be 'weak' marks, particularly if they are used in connection with a number of different products." *A & H Sportswear,* 237 F.3d at 222. This is especially true where marks are applied to products and services in the same market. *See Fisons,* 30 F.3d at 479. Defendants produced evidence that both the words "Free" and "People" are frequently used by a number of third parties in connection with clothing, as reflected by a number of marks currently registered in the Trademark Office, including "Freegirl" and "Funky People." (Defs.Ex. 13.) This evidence offers some support for a finding that consumers are less likely to associate a label using the words "Free" or "People" with a particular source, thus weakening the "Free People" mark.

With respect to the second part of the test of a mark's strength, its commercial strength or marketplace recognition, however, the Court finds that the Free People mark is particularly strong. The Plaintiffs produced a large amount of documentary evidence and testimony at the preliminary injunction hearing about the well-established nature of the Free People brand. In addition to being sold in catalogs and over the internet, Free People clothing is sold in eight Free People stores in the United States as well as in a large number of boutiques in department stores, Urban Outfitters retail stores and other third party retail stores. Plaintiffs submitted numerous catalogs, advertisements and articles promoting and describing the unique characteristics of the Free People brand. (Pls.Exs.20–174.) In addition, Richard

Hayne testified in detail about the thirty year history of Urban's use of the Free People brand, and its position in the marketplace. Glen Senk, the Executive Vice President of Urban Outfitters in charge of supervising the Anthropologie and Free People brands, also testified about the great care taken by Urban Outfitters in developing and marketing the Free People brand. This brand development is very detail-oriented: in addition to designing and decorating Free People stores in a distinctive manner, they play a certain type of music at those stores and diffuse a specific scent into the air.

Overall, sales of Free People-branded apparel were estimated to be around $80 million in 2006. Notwithstanding the frequency with which the words "Free" and "People" appear in marks in the apparel industry, the Urban Group's substantial investment in the Free People brand and its position in the national marketplace, along with its status as an arbitrary or fanciful mark, both support a finding that Free People is a strong mark entitled to a high level of protection.

### 4. *Factors Indicative of the Care and Attention Expected of Consumers (Lapp Factor 3)*

■ The third Lapp factor relates to the level of sophistication and discernment employed by consumers in selecting the relevant product. *A & H Sportswear,* 237 F.3d at 225. Obviously, depending on the price and durability of a product, consumers will spend more or less time evaluating different options before settling on one to purchase. For example, consumers are going to be much less likely to be confused by the similarity in two marks when choosing between cars than when buying an air freshener to hang from the rearview mirror of a car. Moreover, trained professionals making a purchase related to their chosen field are generally going to be

more sophisticated and exercise a higher level of discernment in distinguishing between products. In the case of a mixed buyer class, one which consists of professional buyers and consumers, "then the issue will center on the consumers, for confusion within the lowest stratum of 'reasonably prudent buyers' may give rise to liability even if professional buyers in the market are not confused." *See Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 293 (3d Cir.1991) (internal quotation omitted).

In this case, the purchasers of Free People and True People goods are a mixed buyer class, consisting of both wholesale buyers and retail consumers. Both brands of clothing are marketed to young women, although the True People brand is a line of junior's clothing, targeted generally at young women around the age of seventeen, (Tr. 81, Jan. 12, 2007), whereas Free People is a line of young contemporary clothing, generally targeted at women who are in their mid to late twenties. (Tr. 100–101, Jan. 19, 2007.) Plaintiffs contend that the prices of True People and Free People clothing are converging, and that even sophisticated consumers have been confused by Defendants' True People brand. Defendants counter that the lower price points at which True People goods are currently sold and will be sold in the future, along with the lower socio-economic level of consumers of True People goods, make it unlikely that consumers will confuse the True People and Free People brands.

The Court finds that, even if Defendants carry out their plan to increase the price of True People clothing in the rebranding process, that clothing will continue to be sold at a much lower price point than Plaintiffs' clothing. (Defs.Exs.14, 20, 68.) The price for Streetbeat's products currently ranges from $5 to $15 at wholesale with an average wholesale price of $8 and an average retail price of $18. (Tr. 73–75, Jan. 12, 2007.) By contrast, Free People clothing sells at retail prices between $68 and $188. (Tr. 68, Jan. 9.2007.) Defendants produced evidence that the future prices of True People goods sold at the Max Rave stores are likely to be equally low. A comparison chart compiled by the Defendants comparing True People wholesale prices and projected retail prices for various clothing items offered at the August 2006 Magic show with wholesale and retail prices for corresponding Free People items shows percentage price differences ranging from 250% at the lowest to 1,221% at the highest.

The Court finds that this factor weighs in Defendants' favor. The relatively high price at which Free People goods are sold make consumers of those goods particularly likely to be discriminating in selecting clothing. *See Checkpoint,* 269 F.3d at 284 ("If the goods or services are relatively expensive, more care is taken and buyers are less likely to be confused as to source or affiliation."). As Richard Hayne testified, female consumers are "very selective, very choosy" in deciding what clothing to purchase. (Tr. 70–71, Jan. 9, 2007.) Even the consumers of the less expensive True People clothing are likely to be discerning in distinguishing between brands. *See A & H Sportswear,* 237 F.3d at 225 (noting that trial court's conclusion that consumers are discriminating in selecting swimwear "rings especially true"). Although not falling under a traditional definition of a "sophisticated" consumer, it can hardly escape the notice of anyone who has spent time with a teenaged girl that they place a significant amount of importance on clothing brands and styles. This point was reenforced by the hearing testimony in this case, as a number of individuals who work in the apparel industry testified about the importance of branding and image on capturing a segment of this highly competitive market.

Finally, while recognizing that this factor should be measured by the least sophisticated consumers of the goods at issue, the same conclusion obviously holds true for the wholesale purchasers of this clothing, such as those who attend the Magic show, who as professional buyers of clothing are very discerning in making purchasing decisions.

**5. *Length of Time the Defendant has Used the Mark Without Confusion and Evidence of Actual Confusion (Lapp Factors 4 and 6)***

■ Since evidence of actual confusion is often difficult to find, it may be highly probative of a likelihood of confusion. *See Checkpoint,* 269 F.3d at 291. At the same time, such evidence is unnecessary to show a likelihood of success in a trademark action. *See Fisons,* 30 F.3d at 472. Conversely, "[w]hen parties have used similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products, there is an inference that future consumers will not be confused either." *Fisons,* 30 F.3d at 476. Defendants make much of the fact that Streetbeat has been using the True People mark on junior's clothing for over six years resulting in millions of dollars in sales and, aside the evidence from the August 2006 trade show, the Plaintiffs have been unable to show any evidence of actual consumer confusion between True People and Free People goods. (Def.'s Pre–Hearing Br. 25–26.) Plaintiffs respond that, until recently, True People served as a label for primarily denim goods that were sold only at low-end discount clothing retailers that do not compete with the Free People brand. Plaintiffs are concerned that the Defendants have now affixed the True People mark to a completely new line of clothing, which they unveiled at the August 2006 Magic show.

Albert Papouchado testified without contradiction that the True People mark has been used interchangeably with several other marks owned by Streetbeat on jackets, pants, dresses, and shirts since its inception and sold to various low-priced retailers all over the country at a rate of approximately 500,000 units per year, accounting for roughly 25% of Street Beat's yearly $35 million in sales. (Tr. 30, 64–65, Jan. 12, 2007.) Mr. Papouchado stated that, prior to 2006, seventy percent of the goods manufactured under the label True People were denim, but he also identified a number of other types of clothing, most of them from the Magic show, as similar in style to those he had sold under the True People mark prior to 2006. These items of clothing included a "shortall," a terry dress, shorts in a camouflage print, a suspender vest, plaid shorts, a pair of pants, a shirt dress, a white lace up shirt, and an eyelet dress. *Id.* The Court finds that, on this specific issue, Mr. Papouchado's testimony is credible. Although Mr. Papouchado was unable to document all of these sales because a warehouse fire destroyed many of Streetbeat's records, he exhibited a high degree of knowledge about the wholesale apparel industry in general and his business in particular. If the issue in this case involved only Streetbeat's past use of the True People brand, the fourth Lapp Factor would strongly favor a finding that Plaintiffs are unlikely to succeed in showing a likelihood of confusion. The Plaintiffs have been unable to produce any evidence of actual confusion by customers between True People and Free People goods prior to August 2006. (Tr. 77–79, Jan. 9, 2007; Tr. 114–17, Jan. 12, 2007; Defs. Ex. 4, at 166–67.)

However, the Defendants' future plans for the True People brand, if carried out, will by all accounts involve a significant shift in how the True People mark is marketed, advertised, designed and priced. With respect to the future plans for the True People brand, which may involve renaming the stores currently owned by Max

Rave "True People," selling mostly non-denim goods under the True People label, and moving the brand up in price point, the Court finds the evidence relating to the co-existence of these two brands for six years is not determinative on the question of whether Defendants' future use of the True People mark is likely to cause confusion.[6] 4 *McCarthy on Trademarks and Unfair Competition* § 23:18 (4th ed. 2006) ("If the junior user's mark has not yet appeared on the market, the lack of actual confusion evidence is irrelevant."). Since the new incarnation of the True People brand has not yet appeared on the market, the Court must instead consider the evidence of confusion from the August 2006 Magic show, the parties' intent and consumer survey evidence presented by the parties.

#### a. *Evidence from the August 2006 Magic Show*

In this case, Plaintiffs introduced the declarations of three individuals who at-tended the Magic tradeshow and who exhibited varying levels of confusion between the True People and Free People marks.[7] Gina Humpreys, the owner of a women's clothing boutique who had a meeting scheduled with a representative from Free People, stated she almost entered the True People booth because she believed it to be the Free People booth. (Pls.Ex. 213.) Gary Rafferty, an analyst who focuses on retail and apparel companies, also had a meeting scheduled at the Free People booth. He stated he initially approached the True People booth, thinking that, because of the font of the True People logo, the similarity of the names, and the appearance of the booth, that it was in fact Free People. Even when he realized the booth actually belonged to True People, Mr. Rafferty continued to wonder whether Free People had changed its name or the two labels were related. (Pls.Ex. 290.) Finally, Christine Chen, a senior research analyst, also asserted that the True People

---

**6.** Indeed, as discussed in more detail below, an analysis of whether there is a likelihood of confusion between two marks, with respect to the infringing mark's prior incarnation as compared to its new form, is a necessary precursor to a discussion of whether a plaintiff's delay in bringing suit is excusable due to the doctrine of progressive encroachment. As the Second Circuit explained in *ProFitness Physical Therapy Ctr. v. Pro–Fit Orthopedic & Sports Physical Therapy P.C.*, "[t]he doctrine of progressive encroachment ... focuses the court's attention on the question of whether defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks." *ProFitness*, 314 F.3d 62, 70 (2d Cir.2002). Before reaching the issue of progressive encroachment, the district court must first determine whether the defendant's expansion in the use of its mark led to a greater likelihood of confusion than its prior use. *Id.; see also Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 573 (6th Cir. 2000) ("In evaluating a plaintiff's claim of progressive encroachment, a court must perform a likelihood of confusion analysis, informed by factors such as whether the defendant has brought itself more squarely into competition with the plaintiff, whether the defendant has made changes to its mark over the years so that it more closely resembles plaintiff's mark, whether the parties market to the same customers or area, and whether the parties sell products interchangeable in use.").

**7.** Defendants challenged the admissibility of these declarations in a Motion to Exclude dated January 8, 2007. The Court denied this motion the following day, subject to Defendants having an opportunity to depose these witnesses, which they did. Such declarations are admissible as evidence in a preliminary injunction proceeding. "It is well established that a 'preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" *Kos.*, 369 F.3d at 718 (internal quotation omitted).

name perplexed her, and she entered the True People booth before her scheduled meeting with a Free People representative. (Pls.Ex. 318.)

Defendants argue that the Court should not credit the evidence of the two analysts because they are not the intended consumers of the parties' products and, furthermore, any initial confusion between the two marks was promptly alleviated. (Defs.Br.29–32.) While only Ms. Humpreys was a potential customer for Free People clothing as a wholesale buyer, the court finds that the evidence of all three witnesses tends to support a conclusion that there is a likelihood of confusion between these two marks in certain marketing situations. *See Kos,* 369 F.3d at 711 (recognizing protection under the Lanham Act extends to "confusion, mistake, or deception of *any kind,* not merely of purchasers nor simply as to source of origin" (quotation omitted)). Moreover, these declarants were not employed by Urban, making their declarations unlikely to be biased or self-serving. *See Citizens Fin. Group, Inc. v. Citizens Nat. Bank of Evans City,* 383 F.3d 110, 122 (3d Cir.2004) (noting actual confusion evidence collected by employees should be viewed with suspicion); *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.,* No. 05–5259, 2006 WL 892718, at *10 (D.N.J. Apr.4, 2006) (viewing with skepticism reports of actual confusion gathered and reported by plaintiff's employees).

Moreover, actionable confusion under the Lanham Act is not limited to consumer confusion at the point of sale. Instead, evidence of initial confusion, even if that confusion was alleviated before point of purchase, is also protected. Without this protection, "an infringer could use an established mark to create confusion as to the product's source thereby receiving a 'free ride on the goodwill' of the establish mark." *Checkpoint,* 269 F.3d at 295. Po-

tential buyers at the Magic show are sophisticated consumers with a high level of brand awareness, and at least one customer showed some initial confusion about the relation between the brands. Individual consumers who lack the same degree of sophistication as wholesale buyers encountering a True People store in a mall may be similarly confused. *Id.* at 296–97.

Defendants argue that, even if the Court were to credit this evidence, evidence that a single consumer was confused is de minimus and insufficient to support a finding of actual confusion. However, cases finding isolated instances of actual confusion insufficient to support a finding of likelihood of confusion typically relate to competing marks that have been operating on a national scale in the same market for a long period of time. *See, e.g., Id.* at 298–99 (agreeing with district court that evidence of initial interest confusion was de minimus given the length of time the parties had operated together in the United States); *A & H Sportswear,* 237 F.3d at 208, 227 (discounting evidence of actual confusion where marks on competing swimwear lines had been sold nationally for more than three years, accounting for millions of dollars of sales); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1230 (3d Cir.1978) (plaintiffs' evidence of nineteen misdirected letters over a four year time period during which the defendant sold fifty million cans of product insufficient to show pattern of confusion in the marketplace). When compared with the possible confusion arising from a national release of True People-branded clothing in stores named True People, three instances of actual confusion at the Magic show take on greater significance. *Cf. Dominion Bankshares Corp. v. Devon Holding Co., Inc.,* 690 F.Supp. 338, 347 (E.D.Pa.1988) (Katz, J.) (issuing preliminary injunction enjoining use of defendants' mark based in part on plaintiff's ability to identify an incident

of actual confusion "despite the fact that defendants' business has not yet become operational" because "[a]ctual confusion is one of the most reliable indications of the likelihood of confusion").

Depending on the individual factual circumstances of a case, evidence of initial interest confusion will be entitled to more or less weight. Notwithstanding the Court's conclusion that the level of sophistication of consumers of women's clothing weighs in favor of the Defendants as discussed above with respect to the third Lapp Factor, the actual confusion evidence produced by the Plaintiff suggests that, at least initially, consumers are likely to be confused by the two marks if Defendants start selling True People branded clothing in a manner similar to Plaintiffs in boutiques in department stores and in free-standing stores. These parties' involvement in the same market, combined with the Court's finding that the Defendants intended to capitalize on Plaintiffs' mark when adopting the True People mark, make this initial interest evidence particularly probative in suggesting a likelihood of confusion between the two brands. *See Checkpoint,* 269 F.3d at 297–98. This factor therefore weighs in favor of the Plaintiffs.

### b. *Survey Evidence*

"In borderline cases where evidence of actual confusion is not available or is not overwhelming, the gap should be filled by a properly conducted survey of the relevant class of prospective customers of the goods or services at issue." *McCarthy* § 23:17. In some cases, such survey evidence can serve to demonstrate evidence of actual confusion, but only to the extent that the survey replicates the real world setting in which instances of actual confu-

sion would occur. *Id.; see also M.D. On-Line, Inc. v. WebMD Corp.,* No. 05–4081, 2005 WL 2469668, at *7 (D.N.J. Oct.6, 2005); *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.,* 952 F.Supp. 1084, 1098 (D.N.J.1997). This evidence serves as circumstantial, and not direct, evidence of a likelihood of confusion. *McCarthy* § 32:184

Both parties in this case submitted expert testimony reporting survey evidence which they claim supports their respective positions. At nine different shopping malls, interviewers administered surveys to randomly selected young women in both brands' targeted age range, ages thirteen to twenty-five, who told the interviewers that they had made a clothing purchase in the last month. (Tr. 40–48, Jan. 11, 2007.) The respondents were shown a copy of the True People catalog Defendant had distributed to wholesale buyers at the Magic show. The interviewers then removed the catalog and asked the respondents to identify the brand of the clothing they had just viewed from a list of eight different brands or to answer "none of the above" if the brand was not included in the list. Half the surveys contained a response of "Free People" and the other half included a control group response intended to control for "noise" generated by random guesses or other factors. All of the listed brands were actual brands found in the marketplace, including "No Boundaries" and "Baby Phat," with the exception of the control group brand. The Court finds that, while the survey methodology of both surveys was sound,[8] both survey designs suffer from limitations that make their conclusions difficult to credit. In other words, the Court concludes neither survey is entitled to significant weight.

---

**8.** Defendants' expert conceded during the hearing that Plaintiffs' survey was conducted properly. (Tr. 181, Jan. 11, 2007.)

Plaintiffs' expert Robert Klein testified that, using a control of "Classic People," the results of his survey showed a 16.4% likelihood of confusion between the marks "True People" and "Free People." *Id.* at 55. Mr. Klein stated he used the True People catalog distributed at the Magic show because it was the closest approximation of market realities available when the proposed True People line is not currently being sold in stores.[9] According to Mr. Klein, when the brand is being marketed in this context, it is impossible to separate out confusion with the name from confusion with the images in the catalog. He chose the word "Classic" to operate as a control because he believed it was relatively neutral and did not infringe on the Free People mark as, for example, a proxy like "Pure People" might. *Id.* at 92.

The Defendants' expert, Michael Rappeport used the phrase "American People" as a control and designed a survey that was methodologically similar to that of the Plaintiffs. (Tr. 161, Jan. 17, 2007.) Dr. Rappeport testified that 14% of the respondents to his survey selected the control response of "American People," as opposed to the 4% of respondents who chose "Classic People" in the Klein survey. Dr. Rappeport reported that, after subtracting the percentage of respondents who chose "American People" from the percentage of respondents who chose "Free People", the survey results show a 6% rate of confusion. (Tr. 168–70, Jan. 11, 2007.) To the best of his knowledge, courts have never found such a low percentage to show a likelihood of confusion. Dr. Rappeport explained that the difference in responses between the "American" control and the "classic" control is that "American" is a neutral word while "classic" has a specific connotation with respect to clothing styles. *Id.* at 63.

"The probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate." *Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.,* 19 F.3d 125, 134 (3d Cir. 1994) (internal quotation omitted). The Court finds that Plaintiffs' expert survey's use of the "classic" control suffers from a significant shortcoming that limits its probative value in showing a likelihood of confusion between the brands. The Court disagrees with Mr. Klein's assessment that the word "classic" is neutral when applied to clothing styles. As Plaintiffs' own witness testified, the word "classic" has a distinct connotation and is commonly associated with clothing brands such as Ann Taylor, Talbot's and Brooks Brothers, brands that do not traditionally compete with Free People or True People.

The Defendants' expert report shows that another, different control, led to a very different confusion rate between the marks—16.4% versus 6%. This presents

---

9. Both experts testified at length about whether the survey was designed to measure reverse or forward confusion. According to Dr. Rappeport, Mr. Klein's survey tested whether Classic People would be confused with True People instead of whether it would be confused with Free People. (Tr. 82, Jan. 17, 2007.) Reverse confusion occurs when "the junior user saturates the market with a similar trademark and overwhelms the senior user." *A & H Sportswear,* 237 F.3d at 228. The only difference between testing for forward and reverse confusion is who should be interviewed: "In a traditional case claiming 'forward' confusion, not 'reverse' confusion, the proper universe to survey is the potential buyers of the junior user's goods or services. But in a 'reverse' confusion case, it is appropriate to survey the senior user's customer base." *McCarthy* § 32:159. Rappeport's critique that the respondents should have been shown a Free People catalog is unpersuasive. The customer base for both products is the same, making the survey probative of both forward and reverse confusion.

useful evidence of the likelihood of consumer confusion between "Free People" and "True People." In the absence of a "why" question (i.e. why did you select that response), however, the Court finds that neither expert can testify conclusively as to the reasons for the difference in that response rate. Although Dr. Rappeport's conclusion that the disparity in responses between "American People" and "Classic People" was the result of the respondents' belief that the clothing styles in the True People catalog were not "classic" could very well be correct,[10] (Tr. 158, Jan. 11, 2007), it is of limited evidentiary value since it is based on Dr. Rappeport's qualitative interviews about the meaning of the word "classic" and his own impressions of that word. *Id.* at 158–60. Defendants criticized the Plaintiffs' expert for not asking a "why" question in his survey, but their own survey suffers from the same limitation. Although Defendants' expert may have theories about why 10% more of respondents chose the "American People" control over the "Classic People" control, those theories are of limited utility. Nonetheless, the disparity in response rates alone suggests that "Classic People" was a poor control.

At the same time, the Court also finds that the use of the "American People" control suffers from its own limitations and therefore fails to conclusively demonstrate the absence of a likelihood of confusion between the True People and Free People marks. Defendants' screening survey for potential survey respondents specifically listed the store "American Eagle" as one of the stores where respondents may have

shopped in the last month. As Mr. Klein testified, American Eagle is a popular store that caters to young men and women, and six of the nine malls where Dr. Rappeport conducted his study had American Eagle stores. Hearing the phrase "American Eagle" and then filling out a survey with a response "American People" is suggestive and could skew the results in favor of "American People." Mr. Klein's rebuttal testimony on this point was persuasive, particularly his analysis that respondents who answered "yes" to question 4S on the screening survey, asking whether the respondent had shopped at stores such as Abercrombie & Fitch or American Eagle in the last month, or answered "American Eagle" when asked where they were most likely to purchase clothes, were three and four times more likely, respectively, to select American People as a response than those who did not answer those questions positively. Klein testified that this difference was statistically significant. (Tr. 53–56, Jan. 17, 2007.) Defendants' expert himself conceded during his rebuttal testimony that those respondents who were likely to try to "figure out" the right answer might respond to the "American Eagle" cues in the screening survey.

For these reasons, the Court finds that both expert surveys are of limited weight in assessing whether Plaintiffs have shown a true confusion between the two marks. Perhaps the parties will present different surveys to a jury at trial. Because Plaintiffs produced some credible evidence of confusion from attendees at the August 2006 Magic show, the Court concludes that

---

**10.** The Court finds that the extensive testimony by Dr. Rappeport about the 9.8% response rate, which was statistically significant, to the clothing line "No Boundaries" amongst the individuals who were given "Classic People" as their control response is also speculative. The Court agrees that it is possible, as Dr. Rappeport suggested, that this response resulted from the survey participants' association of the images and styles in the catalogue with the name "No Boundaries." (Tr. 159–60, Jan. 11, 2007.) However, an equally plausible explanation for why so many respondents chose "No Boundaries" is that this brand name was recognized by more consumers than the other listed brands.

the sixth Lapp Factor weighs slightly in favor of Plaintiffs.

### 6. *Intent of Defendant in Adopting the Mark (Lapp Factor 5)*

██ Although evidence that a defendant intentionally used a mark to cause confusion is not a prerequisite to determining that the defendant committed a Lanham Act violation, such evidence weighs heavily in favor of finding a likelihood of confusion. *See Checkpoint,* 269 F.3d at 286. In evaluating a defendant's intent, courts should examine not only whether the defendant purposely chose its mark to cause confusion and capitalize on the senior user's good will, but also the "adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion." *Kos,* 369 F.3d at 721; *but see A & H Sportswear,* 237 F.3d at 226 ("A mere intent to copy, without more, is not sufficiently probative of a defendant's *success* in causing confusion to weight such a finding in the plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." (emphasis in original)). Therefore, evidence of a defendant's carelessness in evaluating the potential confusion caused by its mark with that of a senior user is "highly relevant" and will tend to favor a finding of likelihood of confusion. *Id.*

There is no evidence to dispute Albert Papouchado's testimony that he was unaware of the Free People mark when he originally conceived of True People in August of 1999. (Tr. 13, 16, Jan. 12, 2007). The Court also finds that the placement of the True People booth in the young contemporary section near the Free People booth came about as a result of happenstance because Defendants would have preferred to have a booth in the junior's section, where Streetbeat had exhibited True People clothing, along with a number of other labels, in years past. (Tr. 191, Jan. 9, 2007; Tr. 94–95, Jan. 12, 2007.)

Nonetheless, there is significant circumstantial evidence from which the Court concludes that the Defendants intend to capitalize on the goodwill of the Free People mark in the marketing of True People clothing. The Defendants were aware of the Free People mark at the time they began considering using True People in a medium different from before, i.e., as a mark on the line of clothing to be exhibited at the Magic show and sold at Max Rave's recently acquired stores. Although Albert Papouchado repeatedly asserted he was unaware of the Free People mark when Max Rave began considering using Streetbeat's True People mark on its new line of clothing, and that he had no recollection of any conversations about the similarity between the True People and Free People marks, the Court finds that this testimony is not credible. (Tr. 73, Jan 16, 2007; Defs.' Exs. 21–22; Defs' Mem. of Law 27.)

Plaintiffs produced several witnesses who stated they had participated in conversations with both Mr. Papouchado and Max Azria where the similarity between the two marks was discussed. Melanie Cox, the former Chief Executive Officer of G + G and Chairperson of Max Rave, testified that, when Max Azria mentioned potentially using the True People mark for a line of clothing she had developed for the G + G stores, originally called the "Lola" brand, she told him that "it sounded like a bad marriage between True Religion and Free People." (Tr. 210, Jan. 9, 2007.) She further testified that she repeated her "bad marriage" conclusion at several weekly strategy meetings for Max Rave, which were often attended by senior management from BCBG. *Id.* at 211–12.

Melvin Murray, the former General Merchandise Manager for the Rave Girl division of G+G and Max Rave, testified that he attended a meeting in June 2006 between Albert Papouchado, Lynda Campbell, and Lisa Stanley, all employed by Defendants Max Rave, about what brand name to use in the G+G stores purchased by Max Rave. According to Mr. Murrary, there were three names under discussion: True People, Farlow, and another name he could not remember. Mr. Murray recalled Lynda Campbell asking about True People's resemblance to Free People, although he did not recall Mr. Papouchado's response to that statement. Mr. Murray testified that he walked out of the meeting with an impression that there would be a benefit to using True People because of its association with Free People, although he did not testify to specific facts to substantiate that impression. (Tr. 15–16, Jan. 11, 2007.)

Lynda Campbell, who was the former Senior Vice President of Store Operations at G+G Retail at Max Rave, submitted a declaration stating that she told Mr. Papouchado or heard him being told on several occasions that the name True People was too close to Free People. (Pls.' Ex. 1003.) She also stated that she raised this issue at the June 2006 meeting attended by Melvin Murray. Mr. Papouchado responded by suggesting that the stores be rebranded under a different name but that they still sell True People clothing. Ms. Campbell joked that, if the G+G stores sold True People clothing but did not change the name to True People, people might think they were buying Free People clothing instead. According to Campbell, Papouchado laughed at this joke. *Id.*

With Cox, Murray, and Campbell offering consistent statements about this conversation, and Mr. Papouchado denying any knowledge, the Court concludes Mr. Papouchado was concealing his true intentions. Taking this conclusion, together with the conclusion that Mr. Papouchado concealed his intentions about issuing a brochure at the February 2007 Magic show contrary to his sworn declaration, the Court concludes that Defendants have an affirmative intent to initiate a marketing plan in which Defendants would in certain respects imitate the Free People mark in order to cause confusion and to capitalize on Free People's good will. Of all the possibilities available to Defendants when selecting a new name to use on their new line of clothing, Mr. Papouchado led the way in choosing "True People" knowing that it bore some similarity to the Free People mark. Thus, the Court finds that this factor tends to weigh heavily in favor of the Plaintiffs.

### 7. *Whether Goods are Marketed Through the Same Channels of Trade and Advertised in the Same Media (Lapp Factor 7)*

■ With respect to the seventh Lapp Factor, court have recognized that "[t]he greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint,* 269 F.3d at 288–99 (internal quotation omitted). In applying this factor, courts must conduct a fact intensive inquiry that examines, among other things, "the trade exhibitions, publications, and other media the parties use in marketing their products." *Id.* at 289.

Before August 2006, Plaintiffs concede that Defendant Streetbeat did not market or advertise its clothing through the same channels as those utilized for the Free People mark. However, Plaintiffs maintain that the evidence indicates a significant future overlap in marketing and advertising between Defendants' new line of clothing and Plaintiffs' existing Free People brand. Defendants respond that Free

People stores cater to a much higher-end clientele in more expensive surroundings, and there is little potential of overlap between the two brands.

The evidence produced at the hearing shows that Free People is a high-end brand sold in upscale department stores such as Bloomingdales and Nordstrom as well in eight free-standing Free People stores, where are located in class A (upscale) malls. (Tr. 66–67, Jan. 9, 2007.) Furthermore, Plaintiffs invest a large amount of money and time in advertising, marketing and promoting its Free People brand through print advertisements, the internet and catalogs. (Tr. 66–67, Jan. 9, 2007; Tr. 101–124, Jan. 16, 2007.) By contrast, the True People brand, as it was originally conceived, has traditionally been sold in low-end retail chains and has never been sold through the internet or catalogs. Nor have True People goods been sold at any higher end stores similar or comparable to retailers such as Bloomingdales or Nordstrom. (Tr. 30–34, 140, Jan. 12, 2007.)

As noted above, the issue raised by Plaintiffs' Motion is whether the newly conceived version of the True People brand will be sold in the same marketing and advertising channels as those currently utilized by Free People. Even in its new form, the evidence showed it most likely that the price range for the two lines of clothing will differ significantly. *Cf. A & H Sportswear*, 237 F.3d at 225 (noting that similarity in price range favors finding that parties' products overlap in channels of sale and advertising). Defendant Max Rave's recently acquired stores are located almost exclusively in lower-end B and C malls (Tr. 125–28, Jan. 12, 2007), while all eight Free People stores appear in A malls. Nonetheless, Plaintiffs' Free People stores and the stores owned and operated by Max Rave currently overlap in two malls. (Tr. 31, Jan. 9, 2007); *A & H Sportswear*, 237 F.3d at 225 (in finding seventh Lapp factor favored Plaintiff, district court emphasized that plaintiffs' products were sold to stores that compete with the defendants' stores). Moreover, Defendants have discussed selling the True People brand with Macy's department store, (Tr. 109–11, Jan. 12, 2007), which is a current customer for Free People goods. (Tr. 140, Jan. 16, 2007.)

In *Checkpoint Systems, Inc.*, the Third Circuit upheld the district court's conclusion that the seventh Lapp factor did not favor the plaintiffs largely because there was no evidence that the parties' products "were offered at the same time in any magazine, trade show, or distribution network." 269 F.3d at 289. Here, by contrast, both Plaintiffs and Defendants had booths located near each other at the Magic trade show, albeit unintentionally, and a number of the same retailers who took orders from the True People booth were also customers of Plaintiffs'. (Tr. 166–67, Jan. 12; Defs. Ex. 83).[11]

Moreover, the Defendants distributed True People brochures to both the August and February trade show attendees and used a marketing poster that bears some resemblance to the marketing images employed by Urban Outfitters. Glen Senk, the Executive Vice President of Urban Outfitters in charge of supervising the Anthropologie and Free People brands, testified extensively about what he termed were the "iconic elements" of the Free People brand that he had noticed in the True People brochure distributed at the August 2006 Magic show. These elements included the use of a bicycle in the photographs, the handwritten "True People" mark, the use of a flower sketch over an ethnic border print, the style of the hair of the models on the second page of the

---

**11.** Defendants' motion to exclude this evidence will be denied.

catalog, the use of the phrase "True People girl," the layered use of Polaroid photos taped over other art, handwritten text in the catalogs, and superimposing line drawings over the photographs.[12] In addition, Senk noted that the color of some of the pages in the True People catalog was virtually identical to the color of a page in the Urban Outfitters' annual report and that the report referred to the "Free People girl."

Senk's testimony about the iconic elements of the Free People brand was credible. He established that he has extensive experience in the apparel industry. At the same time, his opinion that the similarities between the True People catalog and the Free People catalog was "obscenely coincidental" is only an opinion from one of Plaintiffs' executives who is therefore inherently self-interested. While the True People clothing is lower quality and cheaper than the Free People clothing, the Court finds that there are many similarities between their catalogs. This evidence, together with the intent factor which the Court finds weighs in favor of Plaintiffs, suggests that Defendants may attempt to market their products in a similar manner to those employed by Free People in the future.

Finally, Defendants' own witness, Russell Bowers, the head of Retail Finance Group at BCBG, testified that rebranding of the Rave and G + G stores is essential to make them profitable and that the future plans for rebranding, regardless of whether the True People mark is chosen, will involve renaming the stores, moving them up in price point (although not enough to compete with existing Max Azria brands) and refurbishing the stores.

Even where there are "significant differences in trade channels," a district court may still conclude that these factors weigh in favor of a plaintiff because "perfect parallelism will rarely be found." *A & H Sportswear*, 237 F.3d at 225. Given Defendants' intention to rebrand the stores currently operating under the names G + G and Rave and its stated intention to actively promote that brand, as well as the evidence from the Magic show about the overlap in customers between the parties, the Court finds that this factor weighs in Plaintiffs' favor.

8. ***The Extent to Which Targets of the Parties' Sales Efforts Are the Same (Lapp Factor 8)***

■ When the parties target their sales efforts to the same group of consumers, there is a greater likelihood of confusion between two marks. *See Checkpoint,* 269 F.3d at 289. Again, this is an "intensely factual" inquiry. *Id.* To a certain extent, which way this factor cuts depends on how broadly the court construes the targets of the parties' sales efforts. Both parties in this case sell clothing to wholesale buyers of women's clothing. Indeed, some overlap between the two parties' wholesale customers has already been shown. In addition, both parties target young women as retail customers: what is less clear is whether they target the same group of young women. According to Richard Hayne, when designing Free People "we typically have in our mind a twenty-five year old woman ... [b]ut there is a bleed on either side of that in terms of the

---

12. Senk's testimony that the True People logo in their catalog evoked the "Yotter" font, a font based on the handwriting of one of Urban Outfitters's employees which is widely used in the Free People catalogs, was unconvincing. Although he pointed to numerous instances of the Yotter font in the catalogs, almost all of the font was lower case (unlike the True People mark in its catalog, Pls. Ex. 206) and none of it used the serifs that Senk identified in the True People mark. Furthermore, Senk was unable to identify a single example of the Free People mark itself written in the Yotter font.

demographics, and so we do have a number of teenage customers and it seems to be very popular with teenage girls." (Tr. 18, Jan. 9, 2007.) Albert Papouchado testified about the targeted consumer of True People goods "we think our girl is a seventeen year old girl, but the halo effect of the brand is from a fourteen year old to a twenty-five year old." (Tr. 81, Jan. 12, 2007.) Categorizing the parties' targeted consumers as "young women" would make the parties' targets identical but, even the Court were to segregate the products in "juniors" and "young contemporary," this testimony shows that the "halo" effect of both brands creates a significant overlap. Furthermore, as Glen Senk pointed out, the use of the phrase "young contemporary" in the copy of the True People catalog tends to suggest that Defendants' marketing efforts are targeted at the young contemporary as well as the junior's market. *Id.*

Papouchado testified that the True People line, as it is currently conceived, is geared toward "ethnic" teenage girls who are typically Latino or black with some migration to white customers. (Tr. 81–83, Jan. 12, 2007.) However, Plaintiffs offered evidence that the targeted market for Free People clothing is also ethnically diverse.

On the other hand, the hearing testimony illustrates that the financial means of the parties' targeted consumers are widely disparate. True People customers are generally young women of moderate-to-lower income levels with limited financial means, (Tr. 153, Jan. 12, 2007), and the retail prices at which Defendants' new line of clothing will be sold are at the lower end of the price range for women's clothing. Plaintiffs' customers, by contrast, are "upper middle in almost every respect" who either own or have access to a credit card, and the prices of Free People goods are relatively high. (Tr. 70, 100, Jan. 9, 2007.)

Given that both parties' targeted consumers are young women whose ages substantially overlap, the Court concludes that this factor weighs slightly in favor of the Plaintiffs. At the same time, it does not offer particularly strong support for their position given the disparity in pricing between the two lines of clothing.

**9. Relationship of the Goods in the Minds of Consumers (Lapp Factor 9)**

In assessing the relationships of the goods at issue in the minds of consumers pursuant to the ninth Lapp factor, the question is "how similar, or closely related, the products are." *Kos*, 369 F.3d at 723. In this case, the relationship between the two products is identical: Both products are lines of young women's apparel. Nonetheless, Defendants argue that, given the difference in price between the two clothing lines, the labels affixed to all True People clothing, and the general differences in the quality and style of the clothing sold, customers will not believe that True People products are from the same clothing line.

The Third Circuit has acknowledged that the relatedness of products factor may not favor a plaintiff if the goods "fall under the same general product category but operate in distinct niches." *Checkpoint*, 269 F.3d at 288 (holding that the district court did not clearly err in finding that parties' products were unrelated even though both fell under the broader category of "corporate security" where the plaintiff focused on physical security and the defendant focused on information and computer security). That is not the case here. Both parties manufacture, distribute, and sell young women's apparel, making it reasonable for a consumer to conclude that one company would offer both lines of clothing and increasing the potential for

consumer confusion between the marks. "The question is whether the consumer might ... reasonably conclude that one company would offer both of these related products." *Fisons,* 30 F.3d at 481. Courts have concluded that products are related even when they have far less identify of function than is found here. *Id.* at 481 (citing cases where the relationship of goods was close enough to lead to a likelihood of confusion including: women's scarves and apparel with women's cosmetics and fragrances; liquor with restaurant selling liquor; batteries and lamps with light bulbs and lamps; pipe tobacco and bar accessories with scotch whiskey). Consequently, the Court finds this factor weighs in favor of the Plaintiffs.

### 10. *Other Facts Suggesting the Public Might Expect the Prior Owner to Manufacture Both Products*

█ The final Lapp factor allows courts to "look at the nature of the products or the relevant market, the practices of other companies in relevant fields, and other circumstances that bear on whether consumers might reasonably expect both products to have the same source." *Kos,* 369 F.3d at 724. Plaintiffs argue primarily that they will suffer significant harm if Defendants are allowed to rebrand their new line of clothing under the label "True People." This argument relates more to the second step of the test for whether a court should issue a preliminary injunction, whether there is a likelihood of irreparable harm, than to whether Plaintiffs will be able to show a likelihood of success on the merits of their claim.

The Court nonetheless finds that additional facts tend to show that the public might be likely to confuse the two products. At the hearing, several witnesses discussed the practice of many large clothing designers, including BCBG and Urban Outfitters, to offer more than one line of clothing, which are targeted at different age groups and sold at different price points. Indeed, this is precisely what Defendants plan to do the new line of clothing to be sold in stores owned by Max Rave. BCBG already offers a high end line of clothing, branded as "BCBG Max Azria," which competes directly for the same consumers with the Free People line, and another line of clothing targeted at much the same age range as True People, called "BCBG Girls." True People is meant to fill a different niche than either of these existing lines. It is reasonable to conclude that consumers may expect that a lower-priced line of junior's clothing sold under the label "True People" is more likely to come from the company that sells "Free People" clothing rather than one that sells "BCBG Max Azria" or "BCBG Girls" brand clothing. The Court finds that this final factor also weighs in favor of the Plaintiffs.

### 11. *Weighing the Lapp Factors*

█ As the Court has previously noted, all the parties in this case deal in a highly competitive business in which there is extensive brand competition, where fashions change quickly, and some consumers are unpredictable in their tastes and exercise of their purchasing power. In weighing the Lapp factors, the Court must and will take into effect that Defendants have been selling the True People brand clothing for a number of years without any suggestion of confusion from Plaintiffs or anyone else. Give the lack of evidence of consumer confusion between the True People and Free People brands prior to the August 2006 Magic show, the Court will not enjoin Defendants from selling True People brand clothing in their already established retail outlets. The Court does not deem it feasible or possible, and perhaps not even legally justifiable, to issue any injunction against Defendants as to the style or type of clothing that it sells under the True People brand.

However, the Court does find the evidence supports the issuance of a preliminary injunction against the Defendants establishing new or different retail outlets of the types Defendants have indicated they are considering for the True People brand, because the Court finds the evidence is very strong that as to these outlets, the Defendants' strategy and plans will be likely to confuse consumers with the Free People brand. The Plaintiffs' Free People mark is a strong mark entitled to a high level of protection, and there is significant overlap in the parties' customers and in the products they sell. The Court finds that the Defendants have the intent to "upgrade" the True People brand in both price and method of marketing, although the evidence also strongly suggests that True People brand clothing will be sold at a significantly lower price point than Free People clothing. On balance, the Lapp factors weigh in favor of granting the Plaintiffs limited injunctive relief because Plaintiffs have demonstrated that they are likely to succeed on the merits in this action.

### C. *Likelihood of Irreparable Harm*

██ In seeking a preliminary injunction, "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Opticians*, 920 F.2d at 195. In order to obtain a preliminary injunction, the plaintiff need not show actual damage to its reputation, "[p]otential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark action." *Id.* at 196. When a plaintiff demonstrates a strong likelihood of confusion, irreparable injury results as a matter of course. *Id.* Thus, "trademark infringement amounts to irreparable injury as a matter of law." *Kos*, 369 F.3d at 726.

Plaintiffs have produced evidence of the harm they may suffer if Defendants are allowed to market their new line of clothing under the name True People and to rebrand their stores under the same name. Glen Senk testified about the great care taken by Urban Outfitters in developing and marketing the Free People brand. According to Senk, millions of dollars have been spent developing a consistent product with a distinctive fit and quality, and the wholesale business of Free People accounts for $80 million a year in sales, while the retail business brings in $200 million. He stated that the Free People brand has developed a significant amount of good will and is growing rapidly. He testified that the opening of a large number of True People stores would "devastate" the Free People brand. (Tr. 142, Jan. 16, 2007.) In addition, internet sales present a particular problem, where individuals might more easily confuse the names of the two brands without all the sensory cues available at the Free People stores. *Id.* at 142–43.

Defendant argues that Plaintiffs cannot contend that they have suffered irreparable harm given their long delay in bringing suit to challenge the True People brand. This argument is unpersuasive. Plaintiffs brought suit as soon as they became aware of BCBG's marketing efforts with respect to the True People brand. *See Kos*, 369 F.3d at 727 (rejecting argument that plaintiff's delay in filing suit barred preliminary relief when plaintiff began pursuing administrative proceedings immediately upon learning of the defendant's proposed use of its mark). The Court concludes Plaintiffs have shown a likelihood of irreparable harm if Defendants are allowed to proceed with a plan to rebrand their existing stores and to open new stores or boutiques under the True People name.

### D. *Balancing Harm to Plaintiffs with Harm to Defendants if Injunction is Entered*

██ The third factor in an analysis of whether injunctive relief is appropriate as-

sures that "the issuance of an injunction would not harm the infringer more than the mark's owner." *Opticians*, 920 F.2d at 197. On the issue of the injury to Streetbeat, Mr. Papouchado testified that True People brand clothing represents 25% of Streetbeat's business and many retailers depend on it. It would be "disastrous" for the business if the use of the True People mark was enjoined. According to Papouchado, if an preliminary injunction is issued in this case, Street Beat stands to lose $1.5 million in True People inventory already located on its sales floor and between $1 and 2 million in goods that are currently in the pipeline. (Tr. 162, Jan. 12, 2007.) There also are pending deliveries of True People products currently stored in Streetbeat's warehouse. Finally, any True People garments using labels, snaps, rivets, and buttons bearing the True People labels will be rendered useless because those labels cannot be removed without ruining the garment leading to an additional loss of in excess of $3.5 million. (Tr. 107–08, 162–63, Jan. 12, 2007.) Defendants also claim that Streetbeat has an outstanding purchase order in excess of $1 million to be provided to Defendant Max Rave.

According to Mr. Papouchado, an actual agreement for Max Rave to buy Streetbeat had not been reached as of the hearings, although there is an "intent" to enter into such an agreement. In addition, Defendants assert that there has been no final decision made about whether the Max Rave stores will be called True People or what the name of the clothing sold in those stores will be. At the same time, Russell Bowers testified it is essential to rebrand the Max Rave stores to make them profitable, and it will take between five and six months to rebrand all stores once a final decision has been made about the name. According to Bowers, although other possible names have been considered for the stores, including To the Max, Parallel, and BCBG Girls, all of them have presented problems making the Defendants unlikely to use them. He further testified it would be a "big blow" to Max Rave if an injunction were issued is this case because they are far along with the process of rebranding and it would take three to six months to go through the process again. Mr. Bowers' testimony therefore suggests that True People is in fact the name upon which Defendants are focusing their energy in Defendants' current rebranding plans. While the issuance of a preliminary injunction may cause Defendants some financial harm, this harm would be caused in part by Defendants' insistence on promoting the True People brand, knowing of its similarities with Plaintiffs' Free People brand. On balance, in light of the limited injunctive relief to be fashioned by the Court, which is intended to maintain the status quo, the harm to Defendants does not outweigh the harm to Plaintiffs if such an injunction is not issued.

### E. *The Public Interest*

In a trademark case, the public interest is "most often a synonym for the right of the public not to be deceived or confused." *Opticians*, 920 F.2d at 198. The public interest is of significant consideration in a case involving the free flow of goods, and given the Defendants' use of the True People brand over a number of years, the Court believes that it would not be in the public interest to prohibit Defendants from using that label on its clothing and to carry out the same type of advertising and marketing it has previously used for the True People brand. The Court recognizes that there are is no clear demarcation between that type of marketing and advertising and the type of marketing and advertising that the Court intends to enjoin, but the prohibition against Defendants opening new stores or boutiques under the True People brand or rebranding

their existing stores under that name is specific, definite and enforceable. The public's right not to be confused will be addressed by this relief.

### F. Plaintiffs' Delay in Seeking Relief

 Defendants raise the additional argument that Plaintiffs' delay in bringing this suit even though Street Beat has been using the True People mark in junior's clothing for over five years precludes them from now seeking injunctive relief to enjoin the use of that mark. (Defs.Br.5–6.) Plaintiff responds that, under the doctrine of progressive encroachment, the owner of a trademark is not be required to sue "until the likelihood of confusion caused by the accused use presents a significant danger to the mark." See McCarthy § 31:20. "A relatively low level infringement or use of a similar mark in a different product or service line or in a different territory does not necessarily trigger an obligation to immediately file suit." Id. Instead, it only when "the accused use moves closer or increases in quantity that the doctrine of progressive encroachment requires the trademark to remain alert and to promptly challenge the new and significant acts of infringement." Id.

Although the Third Circuit has not directly adopted the doctrine of progressive encroachment, it has recognized the reasoning behind this doctrine. See University of Pittsburgh v. Champion Products Inc., 686 F.2d 1040, 1046 (3d Cir.1982) (holding that plaintiff's delay in bringing trademark infringement action did not bar its entitlement to prospective injunctive relief where the "character and scope of the alleged infringement changed substantially over the years from a modest program of sales ... to a program of national sales"); Analytic Recruiting, Inc. v. Analytic Resources, Inc., 156 F.Supp.2d 499 (E.D.Pa.2001) (Brody, J.) (recognizing that "[c]hanges in the quality and quantity of the alleged infringement use can excuse delay in suing") (also citing John Wright, Inc. v. Casper Corp., 419 F.Supp. 292, 323 (E.D.Pa.1976), aff'd in part and rev'd in part, 587 F.2d 602 (3d Cir.1978), where court found that there was no evidence of inexcusable delay when the plaintiff pursued legal action as soon as the damage to plaintiff's goodwill as a result of defendant's "merchandising plan of progressive encroachment in the market" became manifest).

Plaintiffs have produced evidence that they were unaware of the existence of the True People mark until the August 2006 Magic show when Defendants displayed their newly conceived version of the True People mark in a large display booth within close proximity to Plaintiff's own Free People booth. Plaintiffs have since learned that Defendants have materially altered the True People mark, started to actively promote it for the first time, and sold it in connection with different goods in a different market segment under the name of a different company. At that point, they promptly took action to enjoin Defendants' use of the True People mark. The Court finds that there was no unreasonable delay in instituting suit that would bar Plaintiffs' claim for injunctive relief. See Analytic Recruiting, Inc., 156 F.Supp.2d at 518 (holding that plaintiff's delay in instituting suit was not unreasonable, precluding its entitlement to injunctive relief, when it did not institute suit until it became aware that defendant had moved into a different market, causing instances of actual confusion).

### V. Conclusion

In the issuance of the preliminary injunction, the Court must, of course, tailor the injunction to the relative harms faced by Plaintiffs if the injunction were not granted, and to Defendants if it were granted, and furthermore consider the

public interest. Considering that this is a preliminary injunction proceeding, although there has been extensive testimony and documentary evidence presented, the Court intends to issue an injunction limited to requiring Defendants to maintain the status quo. The Court finds the appropriate balance here is that the Court will enjoin Defendants from opening any new stores, or boutiques within stores, or renaming existing stores under the name "True People" or from adopting any advertising or marketing practices that were not in place for the True People brand prior to the August 2006 Magic show. Accordingly, Plaintiffs' Motion for Preliminary Injunction Relief and Plaintiffs' Motion for Emergency Relief and Preliminary Injunction will be granted in part and denied in part.

An appropriate Order follows.

### ORDER

AND NOW, this 18 day of April, 2007, it is hereby ORDERED for the reasons stated above in the foregoing Memorandum that Plaintiffs' Motion for a Preliminary Injunction (Doc. No. 6) is GRANTED in part and DENIED in part and Plaintiffs' Motion for Emergency Relief and Preliminary Injunction (Doc. No. 90) is GRANTED in part and DENIED in part. The Court will require Plaintiffs to submit within seven (7) days a proposed form of order carrying out the injunction the Court has indicated it will issue.

Defendants shall submit papers supporting the amount of bond that they believe Plaintiffs should be required to enter, also within seven (7) days.

Each party may respond to the other's filings within seven (7) days thereafter.

Furthermore, Plaintiffs' Motion to Compel and for Sanctions (Doc. No. 38); Plaintiffs' Motion in Limine to Exclude Any Testimony of Defendants' Expert, Michael Rappeport, Based on Opinions Not Contained in His Expert Report (Doc. No. 46); and Defendants' Motion in Limine to Exclude and to Enjoin Further Use of Plaintiffs' Exhibit 304 (Doc. No. 54) are DENIED as MOOT.